IRELL & MANELLA LLP
Steven Marenberg (State Bar No. 101033)
E-Mail: smarenberg@irell.com
Josh B. Gordon (State Bar No. 244818)
E-Mail: josh.gordon@irell.com
Josh Geller (State Bar No. 295412)
E-Mail: jgeller@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone: (310) 277-1010
Facsimile: (310) 203-7199

Attorneys for Plaintiff
QED Holdings, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

QED HOLDINGS, LLC, a Delaware limited liability company,

Plaintiff,

v.

WILLIAM H. BLOCK, an individual; QED PICTURES, LLC, a Delaware limited liability company; QED INTERNATIONAL, LLC, a Delaware limited liability company,

Defendants.

Case No. 2:15-CV-02390

**COMPLAINT FOR TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION**

Plaintiff QED Holdings, LLC ("QED" or the "Company") for its Complaint against Defendants William H. Block ("Block"), QED Pictures, LLC ("QED Pictures"), and QED International, LLC ("QED International") (collectively, "Defendants"), alleges as follows:

## I. INTRODUCTION

1. QED is a prominent independent film company whose recent motion pictures include the highly successful film *Fury*, starring Brad Pitt. For many years, in connection with its motion picture activities, QED has used the trademarks "QED," and "QED International." It has entered into contracts and conducted relationships with motion picture studios, distributors, banks, guilds, actors, directors, and writers under the QED name.

2. Between May 2012 and February 2015, Defendant Block served as QED's CEO and Director—the highest positions in the Company. His written contract and the fiduciary duties imposed by law obliged him to render services "loyally and conscientiously" and exclusively to QED. By both contract and law, all projects that he worked on during his tenure as QED's CEO were the sole and exclusive property of QED. Instead of performing his executive responsibilities exclusively and conscientiously for QED, Block actively and surreptitiously hijacked QED's assets and siphoned QED's opportunities for his personal gain. One of the means he used to do that was to misuse QED's name and trademarks to establish and operate entities controlled not by QED, but by Block personally.

3. In this manner, Block has sown confusion in the motion picture industry and will continue to do so unless he is stopped. Block's misappropriation and commercial use of QED's name and trademarks for his personal gain and in competition with QED was deliberate. It is proscribed by, among other things, the Lanham Act. Therefore, in this action, QED seeks compensatory and punitive damages, as well as injunctive relief.

## II. JURISDICTION AND VENUE

4. This is a complaint for Trademark Infringement and Unfair Competition arising under Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a).

5. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1338(a) and 15 U.S.C. § 1121.

6. This Court has personal jurisdiction over Defendant Block because, on information and belief, Block is domiciled in this jurisdiction, conducts and solicits business in this jurisdiction, and commercially uses the trade name and trademarks that are the subject matter of this Complaint in this jurisdiction.

7. This Court has personal jurisdiction over Defendant QED Pictures because, on information and belief, QED Pictures maintains its principal place of business in this jurisdiction, conducts and solicits business in this jurisdiction, and commercially uses the trade name and trademarks that are the subject matter of this Complaint in this jurisdiction.

8. This Court has personal jurisdiction over Defendant QED International because, on information and belief, QED International maintains its principal place of business in this jurisdiction, conducts and solicits business in this jurisdiction, and commercially uses the trade name and trademarks that are the subject matter of this Complaint in this jurisdiction.

9. Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to the claims occurred in this district.

## III. THE PARTIES

10. QED is, and at all times relevant hereto has been, a limited liability company organized and existing under the laws of Delaware. QED's principal place of business is 11601 Wilshire Blvd., Suite 1900, Los Angeles, California 90025. Among other things, QED finances and produces motion pictures under the

trademark "QED International" and using the QED trade name. A significant aspect of QED's business is interacting with studios, banks, investors, and other third parties with whom it has contracts and professional relationships and who have come to know and trust QED's participation in the motion picture industry.

11. QED is informed and believes, and on that basis alleges, that Defendant Block is an individual domiciled and doing business in the State of California, including in this judicial district and elsewhere.

12. QED is informed and believes, and on that basis alleges, that Defendant QED Pictures is a limited liability company organized and existing under the laws of Delaware. On information and belief, QED Pictures' principal place of business is 9200 Sunset Boulevard, West Hollywood, California 90069.

13. QED is informed and believes, and on that basis alleges, that Defendant QED International is a limited liability company organized and existing under the laws of Delaware. On information and belief, QED International's principal place of business is 9200 Sunset Boulevard, West Hollywood, California 90069.

## IV. FACTUAL BACKGROUND

### A. Media Content Capital Invested Significant Funds in QED and in Block

14. In or around 2002, Block and others formed QED International, a motion picture production and sales distribution company. QED International produced or financed several motion pictures, including *W* (aka *Bush*) and *District 9*. In May 2012, Block and his partners agreed to sell virtually all of the assets of QED International and its related entities to Media Content Capital ("MCC") in exchange for a payment of $25 million and a 25% equity interest in the resulting new company, QED Holdings, LLC (with MCC owning the other 75%). Among other things, QED Holdings, LLC, the Plaintiff here, received all rights, title and interest to all of QED International's motion pictures, including those produced, in progress, or in development.

15. QED also received all rights and title to intellectual property, including the trademarks, owned by QED International and its related entities. As detailed in the Purchase and Contribution Agreement (the "Contribution Agreement") setting forth the terms of the transaction, this expressly included the registered trademark "QED International" and associated goodwill, including the associated trade name "QED," which QED has continued to use in commerce in the motion picture industry. Although Block's former company, QED International, was granted a limited, revocable license to use the name "QED" in limited contexts, that license did not permit such use in connection with any of QED's assets, including QED's motion pictures. Moreover, and in any event, in accordance with its rights under the Contribution Agreement, for all pertinent purposes here, QED has since revoked and terminated that limited license.

16. Approximately $22 million of the $25 million purchase price was invested into QED for the purpose of acquiring additional projects and funding QED's overhead. The remainder of the purchase price—over $3 million—was paid to Block and his partners for the assets contributed by them to form QED, including QED International. This transaction was reflected in a series of written agreements among the parties, including the Contribution Agreement and QED's Operating Agreement, which further set forth the rights and responsibilities of the parties to the transaction and the rules for operating QED, the surviving company after the transaction.

17. Among other things, QED's Operating Agreement precludes Block, as an officer and Director of QED, from assigning "rights in Company property other than for Company purposes." Moreover, it mandates that decisions committing the Company to expenditures in excess of $275,000 be approved by the QED Board of Directors (the "Board"). Similarly, any decision that would cause the Company to assume financial responsibilities, including in the form of debt, in excess of $250,000 must be approved by the Board. Accordingly, decisions to "greenlight"

motion pictures or otherwise incur significant financial commitments (including those relating to the development and production of movies) were supposed to be made by the Board (and not Block, unilaterally).

**B. Block Owed Contractual and Fiduciary Duties to QED**

18. Still further, as part of the sale, QED and Block also entered into an employment agreement (the "Employment Agreement") under which Block agreed to continue as QED's Chief Executive Officer. In addition to his continuing equity interest in the Company, among other things, Block received an annual salary of $650,000, along with the right to receive certain options or other equity compensation. QED also provided Block with numerous employment-related benefits, including a monthly allowance of $2,000 for club memberships, Directors and Officers insurance, participation in the Company's 401(k) plan, and health benefits for Block and his family. After the transaction closed, Block remained a member of the QED Board of Directors. The Board was comprised of four members appointed by MCC, Block, and two members appointed by Block.

19. Among other provisions, the Employment Agreement specified that (1) Block would serve as CEO for a term of 4 years; (2) Block was to perform his duties and obligations as CEO "loyally and conscientiously;" (3) Block was to devote substantially all of his business time and attention to the business of the Company and would not "render commercial or professional services of any nature to any" other person or entity without the Company's written consent; and (4) Block would convey to QED all rights to his "Employee Inventions," *e.g.*, any idea or concept relating to QED's film-related business, and would promptly disclose each such Employee Invention to QED.

20. MCC invested in QED with the goal of growing QED, building the QED brand, and sharing that success with Block, who, as noted, retained a 25% equity interest in QED and agreed to continue as CEO and as a member of the Board. The agreements between the parties, including the Employment Agreement,

reflected, therefore, QED's and MCC's belief that Block would be an important component in their success and, to that end, QED and MCC were investing significant amounts of money and placing significant responsibility and trust in Block. Moreover, as an officer and director of QED, Block assumed certain fiduciary duties to QED as a matter of law, including a duty of loyalty.

21. MCC has acted consistently and faithfully to grow QED. For example, despite being entitled to cash distributions from QED, MCC deferred such distributions and has instead reinvested that money into the Company. Further, two principals of MCC sit on QED's Board and have taken an active management role, including supporting QED development projects, participating in sales efforts, agreeing to investments in scripts and talent, and actively participating in decisions to "greenlight" additional motion pictures.

22. Notwithstanding MCC's and QED's best plans and intentions, by mid-2014 it had become apparent that despite Block's representations, the fees being generated from prior motion picture projects were insufficient to cover the huge operating expenses for the structure Block had improvidently created and that the millions invested by MCC to finance motion pictures were instead being used disproportionately to cover overhead costs. Accordingly, at that time, Block and QED entered into continuing discussions concerning potential ways to restructure the Company and their relationship. However, no restructuring was ever agreed upon or implemented and no changes were ever made to existing agreements. Accordingly, at all relevant times, until no earlier than January 31, 2015, Block remained QED's CEO and a member of QED's Board pursuant to the existing agreements (all of which provided they could only be amended in writing), and Block continued to owe all contractual and fiduciary duties to QED.

### C. Block Intentionally Infringed and Misappropriated QED's Trade Name and Trademarks

23. QED has now discovered that, while Block was serving as QED's CEO, he was actively and surreptitiously working to steal QED's assets and leverage QED's opportunities for his own personal profit. QED's inquiries into the nature of Block's activities during the time he served as QED's CEO are ongoing, and ascertaining the full extent of Block's malfeasance is difficult for many reasons, including because Block controlled the Company and was able to disguise his wrongdoing and because Block has withheld from QED certain information he and others working with him used and generated while he served as CEO. But, at least some of Block's misdeeds have come to light.

1. Block Infringed and Misappropriated QED's Trade Name and Trademark in Forming and Operating in Commerce Defendant "QED Pictures, LLC"

24. While Block served as CEO and a Director of QED, QED began developing the film *Birth of the Dragon*, a biopic about martial arts star Bruce Lee. QED developed *Birth of the Dragon* from the beginning, incurring liabilities of at least $150,000 in connection with its development and paying for Block to travel to China to secure interest and investments in the picture. Nonetheless, Block took prohibited, unilateral action to take sole control of and profit from *Birth of the Dragon*. Notably, QED never knowingly agreed to any arrangement that would permit Block to take QED assets for his own personal gain and to QED's detriment.

25. Specifically, no later than August 4, 2014, Block formed QED Pictures, as to which Block, as an individual, and not QED, owns 100% of the equity and is its sole member. Block created QED Pictures for his sole personal benefit, without authorization from QED.

26. On or about August 5, 2014—one day after forming QED Pictures—Block, on behalf of QED Pictures, executed an agreement between QED Pictures

and Chinese investors pursuant to which those investors agreed to provide $10 million in financing for *Birth of the Dragon* ($5 million in equity and $5 million as a minimum guarantee for distribution rights in China). The investors agreed to make a $1 million down payment shortly after executing the agreement. All of that money, the $10 million and the $1 million down payment, was pledged to QED Pictures—*i.e.*, to Block. Block guaranteed QED Pictures'—*i.e.*, his own company's—performance of its obligations to the Chinese investors by mortgaging, and pledging as collateral, his [non-existent] interest in the screenplay for and other rights to the film *Birth of the Dragon—assets that are currently owned by QED, not by Block or by Block's "QED Pictures" entity*. Block has thus fraudulently pledged as collateral assets he does not own, thereby exposing QED to significant liability.

27. At least the $1 million down payment was paid into an account controlled by Block. Therefore, using the QED name, and again holding himself out as QED, Block solicited and received capital for a production entity fully owned by him for the purpose of producing a film that is rightfully, and actually, owned by QED. Block's use of the QED name in this manner caused actual confusion; representatives of the Chinese investors have recently contacted QED to obtain the rights to *Birth of the Dragon*, expressing surprise and confusion that they had not been dealing with QED all the while.

28. Block's use of the QED name in "QED Pictures" and further use of that name in commerce in connection with at least the motion picture *Birth of the Dragon* was unauthorized and unlawful.[1] For example, the Contribution Agreement

---

[1] Block has impermissibly used the QED name for his personal benefit in other business dealings as well. For example, in or around June 2014, Block executed a nondisclosure agreement with a company called "Family Time Media, LLC" on behalf of "BBJF, LLC." "BBJF" is an acronym for "Bill Block John Friedberg," an entity evidently established—while both were employed by QED—for the personal benefit of Block and another former QED executive, Mr. John Friedberg. However, in that agreement, *"BBJF, LLC" is defined as "QED,"* even though QED had no knowledge of or interest in Block's dealings with Family Time

expressly grants to QED the right to use the QED name in commerce, and further assigns to QED all intellectual property and associated goodwill held by Block's former entity, QED International. In addition, although QED International was granted a limited, revocable license to use the name "QED" in limited contexts, as noted above, that limited license did not extend to using the QED name in conjunction with any rights held by QED, *e.g.*, the right to exploit film opportunities such as *Birth of the Dragon* originated at and developed by QED.

29. Moreover, QED has consistently used the QED name in all of its commercial activities, and that distinctive name symbolizes QED's reputation and identifies QED's entertainment related business.

30. QED is informed and believes, and on that basis alleges, that Block intentionally used the QED name in at least his commercial dealings with the Chinese investors in connection with *Birth of the Dragon*, and, in doing so, intentionally held himself and his wholly owned company, QED Pictures, out as QED. Accordingly, QED is further informed and believes, and on that basis alleges, that those investors, and persons and entities acting in concert with them, as well as other relevant members of the public (such as other third parties and other members of the entertainment industry) have been and will continue to be confused, deceived, or misled as to the origin and affiliation of QED Pictures and that, as a result of such confusion, QED has suffered and will continue to suffer irreparable harm.

---

Media. The agreement states that the parties had been exploring and wished to continue to explore "possible business relationships and opportunities of mutual interest in connection with [a] proposed motion picture slate financing transaction." That is, while CEO and a Director of QED, Block was discussing a side deal, for his and Mr. Friedberg's benefit, involving film financing, which is a core aspect of QED's business. QED is informed and believes, and on that basis alleges, that Block intentionally used QED's name in doing so in order to benefit from QED's reputation and goodwill and to cause confusion as to the origin and affiliation of "BBJF" for personal gain.

2. <u>Block Infringed QED's Trade Name and Trademarks in Connection with Misappropriating the QED Motion Picture, *Dirty Grandpa*</u>

31. In or around 2013, QED began developing the motion picture currently known as *Dirty Grandpa*. Based on a screenplay written by John Phillips and originally owned by Universal Pictures, to which QED had negotiated an option in 2013, *Dirty Grandpa* had the potential to be a significant asset for the Company. The option to *Dirty Grandpa* was acquired by QED Writing, LLC, which is wholly owned by QED. Therefore, the option rights to *Dirty Grandpa* were unequivocally owned by QED. In mid-2013 the QED Board reached the intermediate decision that, as presented, the exposure to QED from *Dirty Grandpa* was too high to approve without further refinements to the project. Thus, although QED did not greenlight the project at that time, QED viewed the project positively and the QED Board encouraged Block and his team to continue to work on the project to improve it creatively and to make the project more attractive to QED from a financial perspective. At no point did QED forfeit or relinquish its rights to *Dirty Grandpa* or indicate to any person or entity that it desired to do so. Rather, the Board understood and expected that Block would continue to develop the project, a QED asset, on behalf of QED.

32. Block continued to work on this motion picture project and, in fact, exercised the option held by QED Writing to acquire the screenplay, thereby placing the rights to the screenplay in QED Writing, which, as noted, is a QED-owned entity. This was appropriate, as the screenplay was brought to QED's attention while Block was QED's CEO, and the project was in development at QED.

33. However, unbeknownst to the Company and in violation of his contractual and fiduciary duties to the Company, Block was actively working to wrest ownership and control of *Dirty Grandpa* from QED and into entities that he solely owned and controlled. Again, QED never knowingly agreed to any

arrangement that would permit Block to take QED assets for his own personal gain and to QED's detriment.

34. In or about September 2014, Block formed an entity entitled "Block Entertainment, LLC" ("Block Entertainment"), which (according to Delaware official corporate records) is 100% controlled by Block and of which Block is the sole member. In addition, in or about September 2014, Block formed another entity entitled "DG Licensing, LLC" ("DG Licensing"),[2] in which Block Entertainment (*i.e.*, Block's 100% owned LLC) is the 100% owner and the sole member. Also, in or around September 2014, Block had formed Grandpa Productions, LLC, ("Grandpa Productions"), yet another limited liability company 100% owned by Block Entertainment, which is its sole member and manager.[3]

35. QED is informed and believes, and on that basis alleges, that DG Licensing was formed by Block to hold rights associated with the *Dirty Grandpa* picture and to enter into lucrative distribution and sales agreements relating to the picture pursuant to which third parties paid money to DG Licensing (instead of to QED). QED is also informed and believes, and on that basis alleges, that Block intends Grandpa Productions to be the production entity for the motion picture, *Dirty Grandpa*, and in furtherance of this plan, Grandpa Productions has entered into certain agreements in further violation of QED's rights, as explained below.

36. Next, Block, purporting to exercise his authority as QED's CEO, caused QED Writing (as noted, an LLC owned 100% by QED) to assign the *Dirty*

---

[2] It takes no great insight to infer that the "DG" in DG Licensing refers to the film *Dirty Grandpa*.

[3] Although it is not unusual for various Special Purpose Vehicle ("SPV") companies to be formed to control licensing or production of motion pictures, what is extraordinary here is that the SPVs are not owned and controlled by the company, QED, with the ownership interest in the picture, but by Block (who is misappropriating ownership and control of the picture through these personally owned and controlled companies).

*Grandpa* screenplay rights to DG Licensing (Block's 100% owned LLC). Specifically, on November 3, 2014—while still the CEO of QED and a member of QED's Board—Block executed, ***for both parties***, an agreement assigning "all of QED's rights in and to" *Dirty Grandpa* from QED Writing, LLC (a QED company) to DG Licensing (a Block company). Specifically, without notice to or approval from the QED Board, *and in exchange for only one dollar ($1),*[4] Block executed the following assignment of rights to DG Licensing, *i.e.*, to himself:

> "QED hereby irrevocably and perpetually transfers and assigns to [DG Licensing], its successors, assigns, and licensees, in perpetuity and throughout the universe, all of QED's present and future right, title and interest in and to [*Dirty Grandpa*] . . . and to exploit the same in any manner and in all media now or hereafter created. To the maximum extent allowed, QED hereby expressly waives, in perpetuity, without limitation, any and all rights in law, equity or otherwise, which QED may have or claim to have with respect to [*Dirty Grandpa*] under any law relating to the 'moral rights' or any similar law throughout the universe . . .."

37. As noted, Block executed this assignment on behalf of both QED Writing, LLC and DG Licensing:


QED WRITING LLC ("QED")
By
Title

DG LICENSING LLC ("PRODUCER")
By
Title

38. And Block exploited those self-assigned rights to *Dirty Grandpa* for his own extra-contractual benefit. For example, Block negotiated a domestic

---

[4] Nominal consideration may be appropriate if an assignment of rights is made within the same corporate entity, such as from one wholly-owned company to another. Such arrangements, and the use of one dollar as nominal consideration, are standard in the industry. However, that is not the situation here, where the rights were sold to an unrelated party. Block transferred *Dirty Grandpa* from a QED entity to a Block-owned entity without authorization, thereby stealing the asset and leaving a mere dollar behind.

distribution agreement with Lions Gate Films, pursuant to which DG Licensing sold distribution rights to *Dirty Grandpa* in exchange for a promise to pay DG Licensing the proceeds resulting from distribution of the picture in the United States. Block likewise negotiated at least 28 foreign distribution agreements in which, to the best of QED's understanding, DG Licensing again sold distribution rights to *Dirty Grandpa* in exchange for payments or the promise to remit payments to DG Licensing (and not to any QED entity). QED is informed and believes, and on that basis alleges, that Block negotiated each of these distribution agreements while holding himself out as working on behalf of QED, including by using a QED email address, QED's business address, by attending film markets using the QED name and expensing his activities to QED, and by using QED employees and assets to effect the diversion of proceeds from *Dirty Grandpa* to his own entity, DG Licensing. Moreover, Block negotiated agreements to ensure that *he* received producer fees and a portion of sales agent fees that would otherwise have gone to QED. Accordingly, QED, which rightfully owns the *Dirty Grandpa* property, is contractually entitled to receive nothing from the exploitation of the picture. Rather, all of the proceeds are directed towards entities owned 100% by Block. Finally, with respect to *Dirty Grandpa*, Block has gone so far as to attempt to sell a portion of "his" receivables from the picture to a third party in exchange for up front and contingent compensation. In this, Block sought to turn his fictional rights in the film into actual cash in hand, exposing QED to potential burdens and liabilities in the process.

39. QED is informed and believes, and on that basis alleges, that through Grandpa Productions, the production LLC mentioned above, Block has retained actors, including Robert DeNiro and Zac Efron, retained a director, and begun filming *Dirty Grandpa*—all without any input, control, or direction from QED, the film's rightful owner. And, as noted, proceeds from the eventual distribution of the

motion picture are contractually committed to Block through DG Licensing, not to QED.

40. Nonetheless, Block has committed ***QED*** to guarantee compensation and residuals to various guilds, such as the Directors Guild of America, in conjunction with *Dirty Grandpa*. Block violated QED's rights in its trade name and in its "QED International" trademark in the process.

41. For example, through its wholly owned company QED Film Productions, LLC, QED is a signatory to a 2012 umbrella agreement with the Directors Guild of America ("DGA"). Under that agreement, QED agreed to "assume any obligation" that QED International, LLC—Block's former company whose assets were rolled into QED as part of the May 2012 transaction—"has or may have to the DGA." On or around January 5, 2015, impermissibly acting for himself and not for QED, Block executed, on behalf of his entities DG Licensing and Grandpa Productions, a security agreement with the DGA for the picture *Dirty Grandpa*. In that agreement, Block pledged as collateral certain assets related to *Dirty Grandpa* to secure compensation owed, or to be owed, to the DGA in connection with that motion picture.

42. Furthermore, also on or around January 5, 2015, Block executed a "Guaranty Agreement" between "QED International, LLC" and the DGA "in order to guarantee the performance" of Grandpa Productions' obligations to the DGA in connection with *Dirty Grandpa*. Using QED's then-business address and, on information and belief, holding himself out as QED, Block executed the Guaranty Agreement on behalf of QED International. Therefore, using QED's trade name and the "QED International" trademark—which was assigned to QED in the Contribution Agreement—and without authorization from QED, Block guaranteed all obligations owed by *his 100% owned* entity, Grandpa Productions, to the DGA.

43. Accordingly, QED is informed and believes, and on that basis alleges, that the DGA, and persons and entities acting in concert with it, as well as other

relevant members of the public (such as other third parties and other members of the entertainment industry) have been and will continue to be confused, deceived, or misled as to the origin and affiliation of QED International and that, as a result of such confusion, QED has suffered and will continue to suffer irreparable harm.

44. Undoubtedly, there are additional motion picture projects that belong to QED under the Employment Agreement and other instances of Block's infringement of QED's intellectual property of which QED is unaware. QED reserves the right to include this malfeasance within the scope of this action when such other instances are discovered.

45. Based on the foregoing, QED alleges at least the following causes of action against Defendants:

## FIRST CAUSE OF ACTION

## INFRINGEMENT OF THE QED TRADE NAME AND QED TRADEMARK

## (Lanham Act § 1125(a)(1)(A))

## (Against all Defendants)

46. QED realleges and incorporates paragraphs 1–45 set forth above as if set forth in full herein.

47. The QED trade name and trademark are distinctive and, by virtue of QED's widespread use of that name and mark in commerce in the motion picture industry, have acquired distinctiveness as an exclusive indicator of the reputation and business of QED.

48. Defendants' use of the QED trade name and trademark in connection with their own actions in the motion picture industry, including in connection with Block's wholly-owned companies "QED Pictures" and "QED International" has been and continues to be explicitly misleading and not authorized by QED. Defendants' use of that name and mark is expressly misleading and likely to cause confusion, mistake, or deception and constitutes trademark infringement in violation of Section 43 of the Lanham Act. 15 U.S.C. §1125(a)(1)(A).

49. Defendants' acts alleged herein were willful and deliberate and have harmed QED in an amount to be determined at trial and such damage will increase unless Defendants are enjoined from their wrongful actions. Because Defendants acted willfully and deliberately, this is an exceptional case.

50. Defendants' infringing use of the QED name and trademark is causing immediate and irreparable injury to QED and to its goodwill and reputation and will continue to damage QED and confuse the public unless enjoined by this Court. QED has no adequate alternative remedy at law to an injunction.

**SECOND CAUSE OF ACTION**

**UNFAIR COMPETITION**

**(Lanham Act § 1125(a)(1)(A))**

**(Against all Defendants)**

51. QED realleges and incorporates paragraphs 1–50 set forth above as if set forth in full herein.

52. Defendants' use of the QED name and QED trademark in commerce is without authority of license from QED. The conscious use of the QED name and trademark, combined with the express or implied representation that the Defendant companies, including QED Pictures, originated with, are associated or affiliated with, or are endorsed or approved by QED, together with Defendants' use of the QED name and trademark to misappropriate QED assets and encumber QED with liabilities, constitute unfair competition in violation of the Lanham Act. 15 U.S.C. § 1125(a)(1)(A).

53. Consumers are likely to be misled and deceived into believing, based on Defendants' representations and conduct, that Defendants are associated or affiliated with QED when no such association or affiliation exists.

54. Consumers are also likely to be misled and deceived into believing, based on Defendants' representations and conduct, that QED has guaranteed liabilities incurred by Defendants.

55. QED is informed and believes, and on that basis alleges, that Defendants' selection, incorporation, and use of the QED name and QED trademark were made with full knowledge of the prior and extensive use by QED of that name and mark and were done with an intent to deceive the consuming public.

56. Defendants' acts alleged herein were willful and deliberate and have harmed QED in an amount to be determined at trial, and such damage will increase unless Defendants are enjoined from their wrongful actions. Because Defendants acted willfully and deliberately, this is an exceptional case.

57. Defendants' infringing use of the QED name and trademark is causing immediate and irreparable injury to QED and to its goodwill and reputation and will continue to damage QED and to confuse the public unless enjoined by this Court. QED has no adequate alternative remedy at law to an injunction.

**THIRD CAUSE OF ACTION**

**INFRINGEMENT OF THE REGISTERED "QED INTERNATIONAL" TRADEMARK**

**(Lanham Act § 1114(1)(a))**

**(Against Defendants Block and QED International)**

58. QED realleges and incorporates paragraphs 1–57 set forth above as if set forth in full herein.

59. QED owns the registered trademark in the name "QED International" and uses that mark in commerce. That mark is also distinctive and, by virtue of QED's widespread use of that mark in commerce in the motion picture industry, has acquired distinctiveness as an exclusive indicator of the origin of products and services of QED.

60. Defendants' use of the "QED International" trademark is explicitly misleading and not authorized by QED, and its use is likely to cause confusion, mistake, or deception and constitutes trademark infringement in violation of Section 32 of the Lanham Act. 15 U.S.C. §1114(1)(a).

61. Defendants' use of the "QED International" trademark was done with full knowledge that QED owns that registered mark, with full knowledge of the prior and extensive use by QED of that name and mark, and was done with a conscious intent to expressly mislead and confuse the relevant public.

62. Defendants' acts alleged herein were willful and deliberate and have harmed QED in an amount to be determined at trial and such damage will increase unless Defendants are enjoined from their wrongful actions. Because Defendants acted willfully and deliberately, this is an exceptional case.

63. Defendants' infringing use of the registered QED trademark is causing immediate and irreparable injury to QED and to its goodwill and reputation and will continue to damage QED and confuse the public unless enjoined by this Court. QED has no adequate alternative remedy at law to an injunction.

## PRAYER FOR RELIEF

WHEREFORE, QED prays for judgment against Defendants as follows:

1. That preliminary and permanent injunctive relief issue restraining Defendants, together with entities owned and/or controlled by Defendants, as well as their officers, agents, servants, employees, representatives, successors and assigns, attorneys, and all those in active concert or participation with them from:

a. Using the QED name and QED trademarks, including "QED International," in commerce, including in connection with Block's company QED Pictures, LLC and in connection with QED-owned films such as *Birth of the Dragon* and *Dirty Grandpa*; or

b. Using the QED name and QED trademarks in connection with any other company unaffiliated with QED and in competition therewith; or

c. Infringing the QED trademarks, unfairly competing with QED, or otherwise injuring QED's business reputation in any manner;

2. That Defendants shall destroy any promotional materials that use the QED trademarks;

3. That Defendants shall pay QED compensatory damages in an amount according to proof;

4. That Defendants shall pay QED actual damages as calculated pursuant to 15 U.S.C. § 1117(a);

5. That Defendants Block and QED International pay QED treble damages as calculated pursuant to 15 U.S.C. 1117(b);

6. That QED be awarded its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a);

7. That QED be awarded its costs in bringing this action;

8. That QED be awarded all such other and further relief as the Court deems just and proper.

Dated April 1, 2015

IRELL & MANELLA LLP

By: ______________________
Steven A. Marenberg
Attorneys for Plaintiff
QED HOLDINGS, LLC