IRELL & MANELLA LLP
Steven Marenberg (State Bar No. 101033)
E-Mail: smarenberg@irell.com
Josh B. Gordon (State Bar No. 244818)
E-Mail: josh.gordon@irell.com
Holley C. Horrell (State Bar No. 287042)
E-Mail: hhorrell@irell.com
Josh Geller (State Bar No. 295412)
E-Mail: jgeller@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone: (310) 277-1010
Facsimile: (310) 203-7199

Attorneys for Plaintiff
QED Holdings, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| QED HOLDINGS, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM H. BLOCK, an individual; QED PICTURES, LLC, a Delaware limited liability company; QED INTERNATIONAL, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 2:15-CV-02390-GW-JEM<br><br>**FIRST AMENDED COMPLAINT FOR TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, CONVERSION, AND VIOLATION OF CAL. BUS. & PROF. CODE SECTION 17200 ET SEQ.** |

Plaintiff QED Holdings, LLC ("QED" or the "Company") for its Complaint against Defendants William H. Block ("Block"), QED Pictures, LLC ("QED Pictures"), and QED International, LLC ("Old QED") (collectively, "Defendants"), alleges as follows:

## I. **INTRODUCTION**

1.     QED is a prominent independent film company whose recent motion pictures include the highly successful film *Fury,* starring Brad Pitt. QED was formed in 2012 in a transaction memorialized in a contract called the Purchase and Contribution Agreement, dated as of May 15, 2012 (the "Contribution Agreement"). By that contract, Block contributed to QED virtually all of the assets and goodwill of his prior company, Old QED (and entities related to Old QED), in exchange for an investment of $25 million by an outside investor, Media Content Capital ("MCC"). Of MCC's $25 million investment, $22 million was to fund film production by the "new" QED. $3 million went to Block and his affiliates. After the transaction closed as of May 2012, the investors owned 75% of QED and Block owned 25%.

2.     Among the assets contributed by Block and his affiliates to QED in the Contribution Agreement were the trademarks "QED" and "QED International." Since May 2012, QED has entered into contracts and conducted relationships with motion picture studios, distributors, banks, guilds, actors, directors, and writers under the QED name and has used the QED trademarks. For all material purposes herein, Block, Old QED, and Old QED's affiliates had no right to use the QED name after May 2012.

3.     Also as a result of the transaction, between May 2012 and February 2015, Defendant Block served as QED's CEO and Director—the highest positions in the Company—pursuant to a written contract (the "Employment Agreement"). Block's Employment Agreement and fiduciary duties imposed by law obliged him to render services "loyally and conscientiously" and exclusively to QED. In

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 1 -
FIRST AMENDED COMPLAINT

addition, Block expressly agreed, among many other things, not to engage in any activity in the media and entertainment industry in competition with QED. By both contract and law, all projects that he worked on during his tenure as QED's CEO were the sole and exclusive property of QED. Instead of performing his executive responsibilities exclusively and conscientiously for QED, Block actively and surreptitiously hijacked QED's assets and siphoned QED's opportunities for his personal gain. As the Employment Agreement has an arbitration clause, QED is pursuing its remedies for these instances of malfeasance by Block in a JAMS Arbitration.

4.     In this proceeding, QED seeks to vindicate its rights to the exclusive use of the QED name and trademarks which have been used by Block and the other defendants, without authorization, in connection with the development, production, and marketing of motion pictures that Block has attempted to and continues to develop and produce in conjunction with the other defendants, entities 100% owned by Block. The misuse of the QED name and trademarks by Block and the other defendants has sown confusion in the motion picture industry and will continue to do so unless it is stopped. Block's misappropriation and commercial use of QED's name and trademarks in competition with QED was deliberate and proscribed by, among other things, the Lanham Act.

5.     In addition, Block agreed in the Contribution Agreement (which does not have an arbitration clause and instead provides that disputes be brought in the federal or state courts of Los Angeles County) that, until at least 5 years from the closing date of May 15, 2012, he would not become engaged in a Competitive Business with QED. Block has breached that covenant; he continues to compete with QED. Moreover, QED has also become aware that Block and Old QED have breached the Contribution Agreement in various other respects which are detailed below. For all of the foregoing breaches other than those remitted to arbitration under the Employment Agreement, QED seeks compensatory and punitive damages,

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 2 -

FIRST AMENDED COMPLAINT

1  as well as restitution and injunctive relief in this action.

2  **II.    <u>JURISDICTION AND VENUE</u>**

3      6.     This is a complaint for, among other things, Trademark Infringement

4  and Unfair Competition arising under Sections 32 and 43(a) of the Lanham Act, 15

5  U.S.C. §§ 1114(1) and 1125(a).

6      7.     This Court has original subject matter jurisdiction over this action

7  pursuant to 28 U.S.C. § 1338(a) and 15 U.S.C. § 1121.

8      8.     As noted, the contract through which Block assigned all right and title

9  to the QED trade name and trademarks to QED, as well as under which he agreed

10  not to compete with QED—the Contribution Agreement—provides that all actions

11  "arising out of or relating to this Agreement shall be heard and determined

12  exclusively in any state or federal court" in Los Angeles, and the signatories to that

13  agreement agreed to submit such actions "to the exclusive jurisdiction of any state

14  or federal court" in Los Angeles. Thus, also included in this complaint are claims

15  arising out of the Contribution Agreement that are premised on state law, including,

16  *inter alia*, breach of contract, conversion, and breach of California Business &

17  Professions Code Section 17200 et seq. This Court has supplemental jurisdiction

18  over these claims under 28 U.S.C. § 1367(a), as these claims share a common

19  nucleus of operative fact with the Lanham Act claims and would ordinarily be

20  expected to be tried together with the Lanham Act claims.

21      9.     This Court has personal jurisdiction over Defendant Block because, on

22  information and belief, Block is domiciled in this jurisdiction, conducts and solicits

23  business in this jurisdiction, and commercially used the trade name and trademarks

24  that are the subject matter of this Complaint in this jurisdiction.

25      10.    This Court has personal jurisdiction over Defendant QED Pictures

26  because, on information and belief, QED Pictures maintains its principal place of

27  business in this jurisdiction, conducts and solicits business in this jurisdiction, and

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 3 -
FIRST AMENDED COMPLAINT

1  commercially used the trade name and trademarks that are the subject matter of this
2  Complaint in this jurisdiction.

3        11.     This Court has personal jurisdiction over Defendant QED International,
4  LLC because, on information and belief, Old QED maintains its principal place of
5  business in this jurisdiction, conducts and solicits business in this jurisdiction, and
6  commercially used the trade name and trademarks that are the subject matter of this
7  Complaint in this jurisdiction.

8        12.     Venue is proper in this district under 28 U.S.C. § 1391(b) and (c)
9  because a substantial part of the events giving rise to the claims occurred in this
10  district.

11  **III.    THE PARTIES**

12        13.     QED is, and at all times relevant hereto has been, a limited liability
13  company organized and existing under the laws of Delaware. QED's principal place
14  of business is 11601 Wilshire Blvd., Suite 1900, Los Angeles, California 90025.
15  Among other things, QED finances and produces motion pictures under the
16  trademark "QED International" and using the QED trade name. A significant aspect
17  of QED's business is interacting with studios, banks, investors, and other third
18  parties with whom it has contracts and professional relationships and who have
19  come to know and trust QED's participation in the motion picture industry.

20        14.     QED is informed and believes, and on that basis alleges, that Defendant
21  Block is an individual domiciled and doing business in the State of California,
22  including in this judicial district and elsewhere.

23        15.     QED is informed and believes, and on that basis alleges, that Defendant
24  QED Pictures is a limited liability company organized and existing under the laws
25  of Delaware, which not until sometime in April 2015 (after this lawsuit was filed)
26  changed its name on Delaware corporate records from "QED Pictures, LLC" to
27  "Sebda Pictures, LLC." On information and belief, QED Pictures' principal place of
28  business is 9200 Sunset Boulevard, West Hollywood, California 90069.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 4 -
FIRST AMENDED COMPLAINT

16.     QED is informed and believes, and on that basis alleges, that Defendant Old QED is a limited liability company organized and existing under the laws of Delaware, which not until sometime in April 2015 (after this lawsuit was filed) changed its name on Delaware corporate records from "QED International, LLC" to "Sebda International, LLC." On information and belief, Old QED's principal place of business is 9200 Sunset Boulevard, West Hollywood, California 90069.

## IV.   FACTUAL BACKGROUND

### A.   Media Content Capital Invested Significant Funds in QED and in Block

17.     In or around 2002, Block and others formed Old QED. Old QED produced or financed several motion pictures, including *W* (aka *Bush*) and *District 9*. In May 2012, Block and his partners agreed to sell virtually all of the assets of Old QED and its related entities to Media Content Capital ("MCC") in exchange for a payment of $25 million and a 25% equity interest in the resulting new company, QED Holdings, LLC (with MCC owning the other 75%). Among other things, QED Holdings, LLC, the Plaintiff here, received all rights, title and interest to all of Old QED's motion pictures, including those produced, in progress, or in development.

18.     QED also received all rights and title to intellectual property, including the trademarks, owned by Old QED and its related entities. As detailed in the Contribution Agreement setting forth the terms of the transaction, this expressly included the registered trademark "QED International" and associated goodwill, including the associated trade name "QED," which QED has continued to use in commerce in the motion picture industry. Although Block's former company, Old QED, was granted a limited, revocable license to use the name "QED" in limited contexts, that license did not permit such use in connection with any of QED's assets, including QED's motion pictures. Moreover, and in any event, in accordance

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 5 -

FIRST AMENDED COMPLAINT

with its rights under the Contribution Agreement, for all pertinent purposes here, QED has since revoked and terminated that limited license.

19. Approximately $22 million of the $25 million purchase price was invested into QED for the purpose of acquiring additional projects and funding QED's overhead. The remainder of the purchase price—over $3 million—was paid to Block and his partners for the assets contributed by them to form QED, assets that included Old QED. This transaction was reflected in a series of written agreements among the parties, including the Contribution Agreement.

## B. **Block Owed Contractual and Fiduciary Duties to QED**

20. Still further, as part of the sale, QED and Block also entered into an employment agreement (the "Employment Agreement") under which Block agreed to continue as QED's Chief Executive Officer.[1] In addition to his continuing equity interest in the Company, among other things, Block received an annual salary of $650,000, along with the right to receive certain options or other equity compensation. QED also provided Block with numerous employment-related benefits, including a monthly allowance of $2,000 for club memberships, Directors and Officers insurance, participation in the Company's 401(k) plan, and health benefits for Block and his family. After the transaction closed, Block became a member of the QED Board of Directors.

---

[1] For context, the Employment Agreement specified, *inter alia*, that (1) Block would serve as CEO for a term of 4 years; (2) Block was to perform his duties and obligations as CEO "loyally and conscientiously;" (3) Block was to devote substantially all of his business time and attention to the business of the Company and would not "render commercial or professional services of any nature to any" other person or entity without the Company's written consent; and (4) Block would convey to QED all rights to his "Employee Inventions," *e.g.*, any idea or concept relating to QED's film-related business, and would promptly disclose each such Employee Invention to QED. As noted, QED is pursuing in arbitration separate claims that arise under or relate to the Employment Agreement, including breaches of various provisions of the Employment Agreement and breaches of Block's fiduciary duties arising from his positions as CEO and Director.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 6 -
FIRST AMENDED COMPLAINT

21.     MCC invested in QED with the goal of growing QED, building the QED brand, and sharing that success with Block, who, as noted, also retained a 25% equity interest in QED. The agreements between the parties, including the Contribution Agreement and Employment Agreement, reflected, therefore, QED's and MCC's belief that Block would be an important component in their success and, to that end, QED and MCC were investing significant amounts of money and placing significant responsibility and trust in Block.

22.     MCC has acted consistently and faithfully to grow QED. For example, despite being entitled to cash distributions from QED, MCC deferred such distributions and has instead reinvested that money into the Company. Further, two principals of MCC sit on QED's Board and have taken an active management role, including supporting QED development projects, participating in sales efforts, agreeing to investments in scripts and talent, and actively participating in decisions to "greenlight" additional motion pictures.

23.     Notwithstanding MCC's and QED's best plans and intentions, by mid-2014 it had become apparent that despite Block's representations, the fees being generated from prior motion picture projects were insufficient to cover the huge operating expenses for the structure Block had improvidently created and that the millions invested by MCC to finance motion pictures were instead being used disproportionately to cover overhead costs. Accordingly, at that time, Block and QED entered into continuing discussions concerning potential ways to restructure the Company and their relationship. However, no restructuring was ever agreed upon or implemented and no changes were ever made to existing agreements. Accordingly, at all relevant times, until no earlier than January 31, 2015, Block remained QED's CEO and a member of QED's Board and remained subject to the existing agreements (all of which provided they could only be amended in writing).

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 7 -

FIRST AMENDED COMPLAINT

**C.     In Connection With the Sale of Assets and Goodwill to MCC, Block and Old QED Agreed Not to Compete with QED**

24.     As part of the sale of virtually all of Old QED's assets, together with its goodwill, Block and Old QED each agreed, as expressly set forth in the Contribution Agreement, not to compete with QED for a period of no less than five (5) years from the closing date of the sale: May 15, 2012 (the "Restrictive Term"). For example, they expressly agreed that, "during the Restrictive Term," they each would "not, without the prior written consent of [QED] . . . directly or indirectly, either alone or in association or in connection with or on behalf of any Person now existing or hereafter created: (i) be or become engaged in, directly or indirectly, with any Competitive Business," which is defined as "any entertainment or media business that is competitive with [QED]." Contribution Agreement, §§ 6.3(a), 1.1. Block and Old QED each further agreed not to invest in any Competitive Business or use their names "or any part thereof" in connection with any Competitive Business. *Id.*

**D.     Block Intentionally Infringed and Misappropriated QED's Trade Name and Trademarks and Breached the Contribution Agreement By Competing with QED**

25.     QED has now discovered that, while Block was serving as QED's CEO, and while he and Old QED were (and continue to be) subject to the non-competition provisions of the Contribution Agreement, he was actively and surreptitiously working to steal QED's assets and leverage QED's opportunities for his own personal profit and for the benefit of his competing entities. QED's inquiries into the nature of Block's activities during the time he served as QED's CEO are ongoing, and ascertaining the full extent of Block's malfeasance is difficult for many reasons, including because Block controlled the Company and was able to disguise his wrongdoing and because Block has withheld from QED certain

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 8 -

FIRST AMENDED COMPLAINT

1  information he and others working with him used and generated while he served as

2  CEO. But, at least some of Block's misdeeds have come to light.

3    1.   Block Infringed and Misappropriated QED's Trade Name and

4         Trademark and Breached the Contribution Agreement in

5         Forming and Operating in Commerce Defendant "QED Pictures,

6         LLC"

7    26.   While Block served as CEO and a Director of QED, *i.e.*, after Block

8  had executed the Contribution Agreement (including on behalf of Old QED), QED

9  began developing the film *Birth of the Dragon*, a biopic about martial arts star Bruce

10 Lee. QED developed *Birth of the Dragon* from the beginning, incurring liabilities of

11 at least $150,000 in connection with its development and paying for Block to travel

12 to China to secure interest and investments in the picture. Nonetheless, Block took

13 prohibited, unilateral action to take sole control of and profit from *Birth of the*

14 *Dragon*. Notably, QED never agreed to any arrangement that would permit Block to

15 take QED assets for his own personal gain and to QED's detriment.

16   27.   Specifically, no later than August 4, 2014, Block formed the competing

17 entity QED Pictures, as to which Block, as an individual, and not QED, owns 100%

18 of the equity and is its sole member. Block created QED Pictures for his sole

19 personal benefit, without authorization from QED.

20   28.   On or about August 5, 2014—one day after forming QED Pictures—

21 Block, on behalf of QED Pictures, executed an agreement between QED Pictures

22 and Chinese investors pursuant to which those investors agreed to provide $10

23 million in financing for *Birth of the Dragon* ($5 million in equity and $5 million as a

24 minimum guarantee for distribution rights in China). The investors agreed to make a

25 $1 million down payment shortly after executing the agreement. All of that money,

26 the $10 million and the $1 million down payment, was pledged to QED Pictures—

27 *i.e.*, to Block. Block guaranteed QED Pictures'—*i.e.*, his own company's—

28 performance of its obligations to the Chinese investors by mortgaging, and pledging

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 9 -

FIRST AMENDED COMPLAINT

as collateral, his [non-existent] interest in the screenplay for and other rights to the film *Birth of the Dragon*—*assets that are currently owned by QED, not by Block or by Block's "QED Pictures" entity*. Block thus fraudulently pledged as collateral assets he does not own, thereby exposing QED to significant liability.

29.     At least the $1 million down payment was paid into an account controlled by Block. Therefore, using the QED name, and again holding himself out as QED, Block solicited and received capital for a competing production entity fully owned by him for the purpose of producing a film that is rightfully, and actually, owned by QED. Although the $1 million down payment evidently was hastily returned to the Chinese investors when Block's misconduct was exposed, Block's use of the QED name in this manner caused actual confusion; representatives of the Chinese investors have recently contacted QED to obtain the rights to *Birth of the Dragon*, expressing surprise and confusion that they had not been dealing with QED all the while.

30.     Block's use of the QED name in "QED Pictures" and further use of that name in commerce in connection with at least the motion picture *Birth of the Dragon* was unauthorized and unlawful.[2] For example, the Contribution Agreement

_____

[2] Block has impermissibly used the QED name for his personal benefit—*i.e.*, in competition with QED—in other business dealings as well. For example, in or around June 2014, Block executed a nondisclosure agreement with a company called "Family Time Media, LLC" on behalf of "BBJF, LLC." "BBJF" is an acronym for "Bill Block John Friedberg," an entity evidently established—while both were employed by QED—for the personal benefit of Block and another former QED executive, Mr. John Friedberg. However, in that agreement, *"BBJF, LLC" is defined as "QED,"* even though QED had no knowledge of or interest in Block's dealings with Family Time Media. The agreement states that the parties had been exploring and wished to continue to explore "possible business relationships and opportunities of mutual interest in connection with [a] proposed motion picture slate financing transaction." That is, while CEO and a Director of QED, and despite his agreement in the Contribution Agreement not to engage in any competitive entertainment business, Block was discussing a side deal, for his and Mr. Friedberg's benefit, involving film financing, which is a core aspect of QED's

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

expressly grants to QED the right to use the QED name in commerce, and further assigns to QED all intellectual property and associated goodwill held by Block's former entity, Old QED. In addition, although Old QED was granted a limited, revocable license to use the name "QED" in limited contexts, as noted above, that limited license did not extend to using the QED name in conjunction with any rights held by QED, *e.g.*, the right to exploit film opportunities such as *Birth of the Dragon* originated at and developed by QED. Indeed, Old QED specifically promised in the Contribution Agreement not to use its "name or any part thereof" in connection with any competitive business, as did Block with his name.

31.     Moreover, QED has consistently used the QED name in all of its commercial activities, and that distinctive name symbolizes QED's reputation and identifies QED's entertainment-related business.

32.     QED is informed and believes, and on that basis alleges, that Block intentionally used the QED name in at least his commercial dealings with the Chinese investors in connection with *Birth of the Dragon*, and, in doing so, intentionally held himself and his wholly owned competing company, QED Pictures, out as QED. Accordingly, QED is further informed and believes, and on that basis alleges, that those investors, and persons and entities acting in concert with them, as well as other relevant members of the public (such as other third parties and other members of the entertainment industry) have been and will continue to be confused, deceived, or misled as to the origin and affiliation of QED

business. QED is informed and believes, and on that basis alleges, that Block intentionally used QED's name in doing so in order to benefit from QED's reputation and goodwill and to cause confusion as to the origin and affiliation of "BBJF" for personal gain. The use of QED International's name, as well as Block's use of his name in the "BBJF" entity was, moreover, a clear violation of each party's covenant in the Contribution Agreement not to use its or his "name or any part thereof" in connection with any competitive business.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 11 -

FIRST AMENDED COMPLAINT

1   Pictures and that, as a result of such confusion, QED has suffered and will continue
2   to suffer irreparable harm.

3       33.     QED is further informed and believes, and on that basis alleges, that
4   Block established and operated QED Pictures in order to finance, produce, and or
5   distribute motion pictures, conduct that is expressly prohibited by the Contribution
6   Agreement.

7           2.    <u>Block Infringed QED's Trade Name and Trademarks and</u>
8                 <u>Breached the Contribution Agreement in Connection with</u>
9                 <u>Misappropriating the QED Motion Picture *Dirty Grandpa*</u>

10      34.     In or around 2013, QED began developing the motion picture currently
11  known as *Dirty Grandpa*. Based on a screenplay written by John Phillips and
12  originally owned by Universal Pictures, to which QED had negotiated an option in
13  2013, *Dirty Grandpa* had the potential to be a significant asset for the Company.
14  The option to *Dirty Grandpa* was acquired by QED Writing, LLC, which is wholly
15  owned by QED. Therefore, the option rights to *Dirty Grandpa* were unequivocally
16  owned by QED. In mid-2013 the QED Board reached the intermediate decision that,
17  as presented, the exposure to QED from *Dirty Grandpa* was too high to approve
18  without further refinements to the project. Thus, although QED did not greenlight
19  the project at that time, QED viewed the project positively and the QED Board
20  encouraged Block and his team to continue to work on the project to improve it
21  creatively and to make the project more attractive to QED from a financial
22  perspective. At no point did QED forfeit or relinquish its rights to *Dirty Grandpa* or
23  indicate to any person or entity that it desired to do so. Rather, the Board understood
24  and expected that Block would continue to develop the project, a QED asset, on
25  behalf of QED.

26      35.     Block continued to work on this motion picture project and, in fact,
27  exercised the option held by QED Writing to acquire the screenplay, thereby placing
28  the rights to the screenplay in QED Writing, which, as noted, is a QED-owned

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 12 -

FIRST AMENDED COMPLAINT

entity. This was appropriate, as the screenplay was brought to QED's attention while Block was QED's CEO, and the project was in development at QED.

36.     However, unbeknownst to the Company and in violation of his contractual and fiduciary duties to the Company, Block was actively working to wrest ownership and control of *Dirty Grandpa* from QED and into entities that he solely owned and controlled. Again, QED never agreed to any arrangement that would permit Block to take QED assets for his own personal gain and to QED's detriment. QED is pursuing the return of all rights to *Dirty Grandpa*, and the return of any other misappropriated QED assets, in the JAMS arbitration.

37.     Nor did QED agree that Block or Old QED could compete with QED in the motion picture industry, particularly with respect to QED assets such as *Dirty Grandpa*. However, in or about September 2014, again despite specifically agreeing not to engage in any competitive business or use his name in connection with any competing business, Block formed an entity entitled "Block Entertainment, LLC" ("Block Entertainment"), which (according to Delaware official corporate records) is 100% controlled by Block and of which Block is the sole member. In addition, in or about September 2014, once again despite specifically agreeing not to engage in any competitive business, Block formed another entity entitled "DG Licensing, LLC" ("DG Licensing"),[3] in which Block Entertainment (*i.e.*, Block's 100%-owned LLC) is the 100% owner and the sole member. Also, in or around September 2014, Block had formed Grandpa Productions, LLC ("Grandpa Productions"), yet another limited liability company 100% owned by Block Entertainment, which is its sole member and manager.[4]

---

[3] It takes no great insight to infer that the "DG" in DG Licensing refers to the film *Dirty Grandpa.*

[4] Although it is not unusual for various Special Purpose Entities ("SPE") companies to be formed to control licensing or production of motion pictures, what is extraordinary here is that the SPEs are not owned and controlled by the company, QED, with the ownership interest in the picture, but by Block (who is

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

38.     QED is informed and believes, and on that basis alleges, that DG Licensing was formed by Block to hold rights associated with the *Dirty Grandpa* picture and to enter into lucrative distribution and sales agreements relating to the picture pursuant to which third parties paid money to DG Licensing (instead of to QED). QED is also informed and believes, and on that basis alleges, that Block intends Grandpa Productions to be the production entity for the motion picture, *Dirty Grandpa*, and in furtherance of this plan, Grandpa Productions has entered into certain agreements in further violation of QED's rights, as explained below.

39.     Next, Block, purporting to exercise his authority as QED's CEO, caused QED Writing (as noted, an LLC owned 100% by QED) to assign the *Dirty Grandpa* screenplay rights to DG Licensing (Block's 100%-owned LLC). Specifically, on November 3, 2014—while purporting to exercise his authority as CEO of QED and a member of QED's Board—Block executed, ***for both parties***, an agreement assigning "all of QED's rights in and to" *Dirty Grandpa* from QED Writing, LLC (a QED company) to DG Licensing (a Block company). Specifically, without notice to or approval from the QED Board, *and in exchange for only one dollar ($1),*[5] Block executed the following assignment of rights to DG Licensing, *i.e.*, to himself:

> QED hereby irrevocably and perpetually transfers and assigns to [DG Licensing], its successors, assigns, and licensees, in perpetuity and throughout the universe, all of QED's present and future right, title and interest in and to [*Dirty Grandpa*] . . . and to exploit the same in

misappropriating ownership and control of the picture through these personally owned and controlled companies that compete with QED).

[5] Nominal consideration may be appropriate if an assignment of rights is made within the same corporate entity, such as from one wholly-owned company to another. Such arrangements, and the use of one dollar as nominal consideration, are standard in the industry. However, that is not the situation here, where the rights were sold to an unrelated party. Block transferred *Dirty Grandpa* from a QED entity to a Block-owned entity without authorization, thereby stealing the asset and leaving a mere dollar behind.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 14 -

FIRST AMENDED COMPLAINT

any manner and in all media now or hereafter created. To the maximum extent allowed, QED hereby expressly waives, in perpetuity, without limitation, any and all rights in law, equity or otherwise, which QED may have or claim to have with respect to [*Dirty Grandpa*] under any law relating to the 'moral rights' or any similar law throughout the universe . . . .

40.     As noted, Block executed this assignment on behalf of both QED Writing, LLC and DG Licensing:

QED WRITING LLC                    ("QED")        DG LICENSING LLC          ("PRODUCER")

By _____        By _____
   Title                              Title

41.     And Block exploited those self-assigned rights to *Dirty Grandpa* for his own extra-contractual benefit and in violation of his obligation not to compete with QED in the media and entertainment business. For example, Block negotiated a domestic distribution agreement with Lions Gate Films, pursuant to which DG Licensing sold distribution rights to *Dirty Grandpa* in exchange for a promise to pay DG Licensing the proceeds resulting from distribution of the picture in the United States. Block likewise negotiated at least 28 foreign distribution agreements in which, to the best of QED's understanding, DG Licensing again sold distribution rights to *Dirty Grandpa* in exchange for payments or the promise to remit payments to DG Licensing (and not to any QED entity). QED is informed and believes, and on that basis alleges, that Block negotiated each of these distribution agreements (i) while holding himself out as working on behalf of QED, including by using a QED email address, QED's business address, (ii) by attending film markets using the QED name (for example, attached hereto as Attachment A is the announcement used by Block using QED's name and trademarks to sell international film distribution rights to motion pictures, including *Dirty Grandpa*, at the recent Berlin Film Festival) and expensing his activities to QED, and (iii) by using QED employees and assets to effect the diversion of proceeds from *Dirty Grandpa* to his

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 15 -

FIRST AMENDED COMPLAINT

own competing entity, DG Licensing. Moreover, on information and belief, again holding himself out as QED, Block negotiated agreements to ensure that *he* received producer fees and a portion of sales agent fees that would otherwise have gone to QED. Accordingly, QED, which rightfully owns the *Dirty Grandpa* property, is contractually entitled to receive nothing from the exploitation of the picture. Rather, all of the proceeds are directed towards entities owned 100% by Block, which he specifically established to compete with QED.

42.     QED is informed and believes, and on that basis alleges, that through Grandpa Productions, the production LLC mentioned above, Block has retained actors, including Robert DeNiro and Zac Efron, retained a director, and begun filming *Dirty Grandpa*—using QED's names and marks—all without any input, control, approval, or direction from QED. And, as noted, proceeds from the eventual distribution of the motion picture are contractually committed to Block through DG Licensing, not to QED.

43.     Nonetheless, Block has committed ***QED*** to guarantee compensation and residuals to various guilds, such as the Directors Guild of America, in conjunction with *Dirty Grandpa.* Block violated QED's rights in its trade name and in its "QED International" trademark in the process.

44.     For example, through its wholly owned company QED Film Productions, LLC, QED is a signatory to a 2012 umbrella agreement with the Directors Guild of America ("DGA"). Under that agreement, QED agreed to "assume any obligation" that Old QED—Block's former company whose assets were rolled into QED as part of the May 2012 transaction—"has or may have to the DGA." On or around January 5, 2015, impermissibly acting for his competing companies (which he owns) and not for QED, Block executed or had executed on his behalf, for his entities DG Licensing and Grandpa Productions, a security agreement with the DGA for the picture *Dirty Grandpa*. In that agreement, Block

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 16 -

FIRST AMENDED COMPLAINT

pledged as collateral certain assets related to *Dirty Grandpa* to secure compensation owed, or to be owed, to the DGA in connection with that motion picture.

45.     Furthermore, also on or around January 5, 2015, Block executed or had executed on his behalf a "Guaranty Agreement" between "QED International, LLC" and the DGA "in order to guarantee the performance" of Grandpa Productions' obligations to the DGA in connection with *Dirty Grandpa*. Using QED's then-business address and, on information and belief, holding himself out as QED, Block executed or had executed the Guaranty Agreement on behalf of Old QED. Therefore, using QED's trade name and the "QED International" trademark—which was assigned to QED in the Contribution Agreement—and without authorization from QED, Block guaranteed all obligations owed by his 100%-owned, competing entity, Grandpa Productions, to the DGA.[6]

46.     Still further, in or around November 20, 2014, Block executed or had executed on his behalf a "Project Agreement," for QED Film Productions, LLC (a QED entity) and Grandpa Productions (a Block entity), in which it was "confirmed" that *Dirty Grandpa* was subject to umbrella agreements between QED Film Productions, LLC and IATSE.[7] As such, holding himself out as QED, Block used the QED trade name to advance his personal, competitive endeavors, without approval from QED.

---

[6] QED notes, on information and belief, that QED Pictures and Old QED apparently have attempted to dodge liability by changing their names on Delaware corporate records. Similarly, Block, through counsel, has asserted that his entities "are not doing any business under[] any iteration of QED." These face-saving moves, however, do not invalidate existing agreements, like the Guaranty Agreement, which deceptively named "QED International, LLC" as a party. Nor do they evaporate promotional materials that have already been distributed, like the email in Attachment A that confusingly associates QED with projects that Block has purported to wrest away into the control of his competing entities.

[7] IATSE is the International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 17 -

FIRST AMENDED COMPLAINT

47.     Other examples of Block's inappropriate uses of the QED name and the QED International mark in competition with QED include the placement of the QED name on the title page of a January 13, 2015 draft of the *Dirty Grandpa* script and the prominent placement of the QED International name on both a February 18, 2015 Crew List and a January 27, 2015 Vendor List for the *Dirty Grandpa* project, thus confusingly signaling to third parties that QED has been involved in recent development efforts for the film. Moreover, in applying for a tax credit from the state of Georgia, where filming for *Dirty Grandpa* occurred, Block misrepresented that Grandpa Productions was a subsidiary of "QED International," thereby again holding himself out as QED to confuse third parties and obtain benefits for the benefit of himself and his 100%-owned entities. Similarly, the QED International name and mark have appeared on marketing materials, such as "one sheets," promoting the film. As QED continues to investigate, additional examples will no doubt come to light.

48.     Accordingly, QED is informed and believes, and on that basis alleges, that the DGA, IATSE, and persons and entities acting in concert with them, as well as other relevant members of the public (such as other third parties and other members of the entertainment industry who, for example, may have received copies of the *Dirty Grandpa* script crediting QED) have been and will continue to be confused, deceived, or misled as to the origin and affiliation of Old QED, Grandpa Productions, and DG Licensing and that, as a result of such confusion, QED has suffered and will continue to suffer irreparable harm.

49.     Undoubtedly, there are additional motion picture projects that belong to QED and other instances, as yet unknown to QED, of Block's breaches of the non-competition provisions of the Contribution Agreement and infringement of and/or misappropriation of QED's intellectual property for the benefit of his own competing entities. QED reserves the right to include this malfeasance within the scope of this action when such other instances are discovered.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 18 -

FIRST AMENDED COMPLAINT

**E.**   **Block and Old QED Breached the Contribution Agreement By Failing to Contribute Pledged Assets**

50.   Pursuant to the Contribution Agreement, Old QED expressly "contribute[d], assign[ed], grant[ed], transfer[red], and convey[ed]" to QED "all of its right, title and interest" to certain Contributed Assets. Contribution Agreement § 2.1. Among many other things, Contributed Assets were defined to include "all cash, cash equivalents, securities, [and] money on deposit with banks . . . ." *Id.* § 2.4(g). Despite this clear covenant, Old QED never assigned, conveyed, or transferred its interest in at least one bank account it maintained at Comerica Bank. Although other accounts and other sums may come to light, QED is informed and believes, and on that basis alleges, that Block and Old QED failed to assign, convey, or transfer approximately $128,000 held in that Comerica Bank account to QED. Moreover, QED is informed and believes, and on that basis alleges, that Block has at all times known about this account and has recently liquidated the account for his and/or Old QED's benefit. QED expects that it may learn of additional cash and/or similar assets that Block and/or Old QED failed to transfer to QED in violation of Sections 2.1 and 2.4(g) of the Contribution Agreement. QED reserves the right to include this malfeasance within the scope of this action when such other instances are discovered.

51.   Further, "Contributed Assets" also included certain Accounts Receivable, including those specifically listed in Section 3.4(b) of certain disclosures Old QED delivered with and represented as accurate in the Contribution Agreement. One such receivable was "AC sales commissions (after delivery)" in the amount of $1,491,072, which referred to sales commissions owed to Old QED in connection with the film *Alex Cross* (*i.e.*, "AC").

52.   Reflecting the importance of these promised receivables, the Contribution Agreement contains representations and warranties regarding their accuracy and validity. For example, Old QED and Block represented and warranted

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 19 -

FIRST AMENDED COMPLAINT

that, *inter alia*, the *Alex Cross* receivable of $1.49 million was a "legal, valid and binding obligation[]" and was "not subject to any set-off or counterclaim relating to the period prior to Closing . . . ." Contribution Agreement § 3.4(b). QED believed and understood these representations and warranties to be true at the time made and relied on them in entering into the Contribution Agreement.

53.     QED never received the promised $1.49 million *Alex Cross* receivable. QED is informed and believes, and on that basis alleges, that Old QED and Block never collected the receivable, but instead used it to offset, at least in part, a $2 million liability Old QED owed to Lions Gate Films.

54.     Based on the foregoing, QED alleges at least the following causes of action against Defendants:

**FIRST CAUSE OF ACTION**

**INFRINGEMENT OF THE QED TRADE NAME AND QED TRADEMARK**

**(Lanham Act § 1125(a)(1)(A))**

**(Against all Defendants)**

55.     QED realleges and incorporates paragraphs 1–54 set forth above as if set forth in full herein.

56.     The QED trade name and trademark are distinctive and, by virtue of QED's widespread use of that name and mark in commerce in the motion picture industry, have acquired distinctiveness as an exclusive indicator of the reputation and business of QED.

57.     Defendants' use of the QED trade name and trademark in connection with their own actions in the motion picture industry, including in connection with Block's wholly-owned companies "QED Pictures" and "QED International" has been and continues to be explicitly misleading and not authorized by QED. Defendants' use of that name and mark is expressly misleading and likely to cause confusion, mistake, or deception and constitutes trademark infringement in violation of Section 43 of the Lanham Act. 15 U.S.C. §1125(a)(1)(A).

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

58.     Defendants' acts alleged herein were willful and deliberate and have harmed QED in an amount to be determined at trial, and such damage will increase unless Defendants are enjoined from their wrongful actions. Because Defendants acted willfully and deliberately, this is an exceptional case.

59.     Defendants' infringing use of the QED name and trademark is causing immediate and irreparable injury to QED and to its goodwill and reputation and will continue to damage QED and confuse the public unless enjoined by this Court. QED has no adequate alternative remedy at law to an injunction.

### SECOND CAUSE OF ACTION

### UNFAIR COMPETITION

### (Lanham Act § 1125(a)(1)(A))

### (Against all Defendants)

60.     QED realleges and incorporates paragraphs 1–59 set forth above as if set forth in full herein.

61.     Defendants' use of the QED name and QED trademark in commerce is without authority of license from QED. The conscious use of the QED name and trademark, combined with the express or implied representation that the Defendant companies, including QED Pictures, originated with, are associated or affiliated with, or are endorsed or approved by QED, together with Defendants' use of the QED name and trademark to misappropriate QED assets and encumber QED with liabilities, constitute unfair competition in violation of the Lanham Act. 15 U.S.C. § 1125(a)(1)(A).

62.     Consumers are likely to be misled and deceived into believing, based on Defendants' representations and conduct, that Defendants are associated or affiliated with QED when no such association or affiliation exists.

63.     Consumers are also likely to be misled and deceived into believing, based on Defendants' representations and conduct, that QED has guaranteed liabilities incurred by Defendants.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 21 -

FIRST AMENDED COMPLAINT

64.     QED is informed and believes, and on that basis alleges, that Defendants' selection, incorporation, and use of the QED name and QED trademark were made with full knowledge of the prior and extensive use by QED of that name and mark and were done with an intent to deceive the consuming public.

65.     Defendants' acts alleged herein were willful and deliberate and have harmed QED in an amount to be determined at trial, and such damage will increase unless Defendants are enjoined from their wrongful actions. Because Defendants acted willfully and deliberately, this is an exceptional case.

66.     Defendants' infringing use of the QED name and trademark is causing immediate and irreparable injury to QED and to its goodwill and reputation and will continue to damage QED and to confuse the public unless enjoined by this Court. QED has no adequate alternative remedy at law to an injunction.

**THIRD CAUSE OF ACTION**

**INFRINGEMENT OF THE REGISTERED "QED INTERNATIONAL"**

**TRADEMARK**

**(Lanham Act § 1114(1)(a))**

**(Against Defendants Block and Old QED)**

67.     QED realleges and incorporates paragraphs 1–66 set forth above as if set forth in full herein.

68.     QED owns the registered trademark in the name "QED International" and uses that mark in commerce. That mark is also distinctive and, by virtue of QED's widespread use of that mark in commerce in the motion picture industry, has acquired distinctiveness as an exclusive indicator of the origin of products and services of QED.

69.     Defendants' use of the "QED International" trademark is explicitly misleading and not authorized by QED, and its use is likely to cause confusion, mistake, or deception and constitutes trademark infringement in violation of Section 32 of the Lanham Act. 15 U.S.C. §1114(1)(a).

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 22 -

FIRST AMENDED COMPLAINT

70.     Defendants' use of the "QED International" trademark was done with full knowledge that QED owns that registered mark, with full knowledge of the prior and extensive use by QED of that name and mark, and was done with a conscious intent to expressly mislead and confuse the relevant public.

71.     Defendants' acts alleged herein were willful and deliberate and have harmed QED in an amount to be determined at trial, and such damage will increase unless Defendants are enjoined from their wrongful actions. Because Defendants acted willfully and deliberately, this is an exceptional case.

72.     Defendants' infringing use of the registered QED trademark is causing immediate and irreparable injury to QED and to its goodwill and reputation and will continue to damage QED and confuse the public unless enjoined by this Court. QED has no adequate alternative remedy at law to an injunction.

**FOURTH CAUSE OF ACTION**

**BREACH OF CONTRACT**

**(Contribution Agreement)**

**(Against Defendants Block and Old QED)**

73.     QED realleges and incorporates paragraphs 1 through 72 set forth above as if set forth in full herein.

74.     On or about May 15, 2012, QED, Block, and Old QED, among others, entered into the Contribution Agreement for good and valuable consideration. The Contribution Agreement is a valid and binding agreement.

75.     QED has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Contribution Agreement, except those, if any, excused by Defendants' material breaches.

76.     Block and Old QED have breached the Contribution Agreement by, *inter alia*, engaging in and with competitive entertainment and media businesses, including without limitation by acquiring, marketing, and producing motion pictures

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 23 -

FIRST AMENDED COMPLAINT

1  through non-QED entities, as well as by failing to contribute pledged assets,
2  including without limitation money on deposit with Comerica Bank and the *Alex*
3  *Cross* receivable of $1,491,072.

4      77.    As a direct and proximate result of Block's and Old QED's breaches of
5  the Contribution Agreement, QED has been damaged in an amount to be proven at
6  trial.

7      78.    Further, as a direct and proximate result of Block's and Old QED's
8  breaches of the Contribution Agreement, QED has suffered and will continue to
9  suffer irreparable harm unless enjoined.

10  **FIFTH CAUSE OF ACTION**
11  **BREACH OF THE IMPLIED COVENANT**
12  **OF GOOD FAITH AND FAIR DEALING**
13  **(Against Defendants Block and Old QED)**

14      79.    QED realleges and incorporates paragraphs 1 through 78 set forth
15  above as if set forth in full herein.

16      80.    As parties to the Contribution Agreement, Block and Old QED were
17  and are bound by the covenant of good faith and fair dealing.

18      81.    Including by, as set forth above, failing to collect the *Alex Cross*
19  receivable pledged to QED in the Contribution Agreement and instead using it to
20  offset, at least in part, a liability that Old QED owed to Lions Gate Films, Block and
21  Old QED have breached the covenant of good faith and fair dealing by acting to
22  deprive QED of the benefits of the parties' agreement.

23      82.    As a direct and proximate result of Block's and Old QED's breaches,
24  QED has been damaged in an amount to be determined at trial.

25  **SIXTH CAUSE OF ACTION**
26  **CONVERSION**
27  **(Against Defendants Block and Old QED)**

28      83.    QED realleges and incorporates paragraphs 1 through 82 set forth

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 24 -

FIRST AMENDED COMPLAINT

above as if set forth in full herein.

84.     Block and Old QED have been and continue to be in possession and custody of QED's property, including approximately $128,000 previously on deposit with Comerica Bank.

85.     Notwithstanding QED's entitlement to possession and control of such property, Block and Old QED continue to knowingly and intentionally withhold such property from QED.

86.     As a direct and proximate result of Block's and Old QED's unlawful denial of such property to QED, QED has been and will continue to be damaged in an amount to be determined at trial, but in no event less than $128,000.

87.     QED is informed and believes, and on that basis alleges, that while engaging in the conduct described above, Block and Old QED acted with malice, fraud, and oppression, and in disregard for QED's rights. Accordingly, QED is entitled to an award of punitive damages, in an amount to be determined at trial, sufficient to make an example of Block and Old QED.

**SEVENTH CAUSE OF ACTION**

**VIOLATION OF CAL. BUS. & PROF. CODE § 17200 ET SEQ.**

**(Against all Defendants)**

88.     QED realleges and incorporates paragraphs 1 through 87 set forth above as if set forth in full herein.

89.     Defendants have engaged and will continue to engage in unlawful acts in violation of California Business and Professions Code Sections 17200 et seq., including without limitation their violations of the Lanham Act in unlawfully competing against QED and their conversion of QED's property. Defendants have profited at QED's expense through these unlawful acts.

90.     As a direct and proximate result of Defendants' unlawful acts, QED has suffered and will continue to suffer irreparable harm unless enjoined.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 25 -

FIRST AMENDED COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE, QED prays for judgment against Defendants as follows:

1.      <u>On the First, Second, Third, and Seventh Causes of Action:</u> That preliminary and permanent injunctive relief issue restraining Defendants, together with entities owned and/or controlled by Defendants, as well as their officers, agents, servants, employees, representatives, successors and assigns, attorneys, and all those in active concert or participation with them from:

      a.      Using the QED name and QED trademarks, including "QED International," in commerce, including in connection with Block's company QED Pictures, LLC and in connection with QED-owned films such as *Birth of the Dragon* and *Dirty Grandpa*;

      b.      Using the QED name and QED trademarks in connection with any other company unaffiliated with QED and in competition therewith; or

      c.      Infringing the QED trademarks, unfairly competing with QED, or otherwise injuring QED's business reputation in any manner;

2.      <u>On the First, Second, Third, and Seventh Causes of Action:</u> For an order mandating that Defendants shall destroy any promotional materials that use the QED trademarks, except for those promotional materials related to films which rightfully belong to QED;

3.      <u>On the First, Second, and Third Causes of Action</u>: An award of Defendants' profits gained as a result of the violations set forth above, together with QED's damages in an amount according to proof and pursuant to 15 U.S.C. § 1117(a);

4.      <u>On the First, Second, and Third Causes of Action</u>: An award of treble damages pursuant to 15 U.S.C. § 1117(a);

5.      <u>On the Fourth Cause of Action:</u> That preliminary and permanent injunctive relief issue restraining Defendants, together with entities owned and/or controlled by Defendants, as well as their officers, agents, servants, employees,

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

representatives, successors and assigns, attorneys, and all those in active concert or participation with them from violating the terms of the Contribution Agreement's non-competition provision;

6.     On the Fourth, Fifth, and Sixth Causes of Action: That Defendants shall pay QED actual damages in an amount according to proof;

7.     On the Sixth Cause of Action: For punitive damages to the extent permitted by law;

8.     On the Seventh Cause of Action: For restitution and/or disgorgement of all benefits that Defendants unlawfully obtained as a result of their unlawful business practices;

9.     On All Causes of Action: That, as provided in the Contribution Agreement and pursuant to 15 U.S.C. § 1117(a), QED be awarded its reasonable attorneys' fees;

10.     On All Causes of Action: That, as provided in the Contribution Agreement and pursuant to 15 U.S.C. § 1117(a), QED be awarded its costs and expenses in bringing this action;

11.     On All Causes of Action: That QED be awarded all such other and further relief as the Court deems just and proper.

Dated May 14, 2015              IRELL & MANELLA LLP


                                By: /s/ Steven A. Marenberg
                                Steven A. Marenberg
                                Attorneys for Plaintiff
                                QED HOLDINGS, LLC

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3353374

- 27 -
FIRST AMENDED COMPLAINT

ATTACHMENT A

| | |
|---|---|
| **From:** | Paul Jun <pjun@qedintl.com> |
| **Sent:** | Sunday, February 1, 2015 8:19 PM |
| **To:** | Jeff.Deutchman@ouralchemy.com; Annie.Cosgrove@ouralchemy.com |
| **Cc:** | John Friedberg <jfriedberg@qedintl.com> |
| **Subject:** | QED International / EFM 2015 Lineup |
| **Attach:** | oledata.mso |





We are pleased to announce the QED International lineup for EFM 2015.

For more information, please visit our website at www.qedintl.com

Should you want to schedule a sales meeting please contact Holly Hartz at
hhartz@qedintl.com

We look forward to meeting with you at Berlin.

**EFM Office**

Ritz Carlton
Suite 750
Potsdamer Platz 3, 10785 Berlin, Germany
+1 (213) 300-0517

**DIRTY GRANDPA**

**Directed By:** Dan Mazer

**Written By:** John M. Phillips

**Starring**: Robert De Niro, Zac Efron,



Zoe Deutch, Aubrey Plaza, Julianne Hough, Dermot Mulroney, Adam Pally and Jason Mantzoukas
**Produced By:** Bill Block, Jason Barrett, Barry Josephson, Michael Simkin
**Status:** In Production
**US Distribution:** Lions Gate
**US Release Date:** August 12, 2016

**Logline:** An uptight twenty-something embarks on a road trip before his wedding to bond with his recently widowed grandfather only to find that his grandpa is a foul-mouthed lunatic on a mission to get laid during Spring Break.



## ROCK THE KASBAH

**Directed By:** Barry Levinson
**Written By:** Mitch Glazer
**Starring**: Bill Murray, Bruce Willis, Kate Hudson, Danny McBride, Zooey Deschanel, and Scott Caan
**Produced By:** Bill Block, Jacob Pechenik, Steve Bing
**Status:** In Post-Production
**US Distribution:** Open Road
**US Release Date:** November 13, 2015

**Logline:** A down-on-his-luck music manager discovers a teenage girl with an extraordinary voice while on a music tour in Afghanistan and takes her to Kabul to compete on the popular television show, Afghan Star.



## RULE OF TWO
## (fka TERM LIFE)

**Directed By:** Peter Billingsley
**Written By:** Andy Liberman
**Starring**: Vince Vaughn, Jon Favreau,
Hailee Steinfeld, Bill Paxton, and
Terrance Howard
**Produced By:** Vince Vaughn, Victoria
Vaughn, and Micah Mason
**Status:** In Post-Production
**US Distribution:** Universal Pictures
**US Release Date:** Q4 2015

**Logline:** A man being hunted by the
mob must stay alive for three weeks
after taking out a life insurance policy
in order to help his estranged
daughter.

## FRANNY

**Written and Directed By:** Andrew
Renzi
**Starring**: Richard Gere, Dakota
Fanning, Theo James
**Produced By:** Kevin Turen, Jay
Schuminsky, Tom Fore, and Jason
Berman
**Status:** Completed
**Logline:** A hedonistic philanthropist
ingratiates himself into the lives of a
newlywed couple in order to recreate
the life he once had.



## THE FAMILY FANG

**Directed By:** Jason Bateman
**Written By:** David Lindsay-Abaire
**Starring**: Nicole Kidman, Jason

Bateman, Christopher Walken, Marin Ireland, and Josh Pais

**Produced By:** Jason Bateman, Nicole Kidman, Daniela Taplin Lundberg, and Riva Marker

**Status:** In Post-Production

**Logline:** Raised in the spotlight by their famously unconventional parents, two adult siblings return home and uncover the mystery about their family.



## MAGIC CITY

**Written and Directed By:** Mitch Glazer

**Starring**: Jeffrey Dean Morgan, Olga Kurylenko, Bruce Willis, and Bill Murray

**Produced By:** Steve Bing, Mitch Glazer, Len Blavatnik, Brett Ratner, Gerry Schwartz, and Alan Helene

**Status:** In Pre-Production

**Logline:** In 1962 Miami, a hotel owner with political influence and money gets embroiled with two powerful mobsters in a plot to kill Fidel Castro.

## TIME OUT OF MIND

**Written and Directed By:** Oren Moverman

**Starring**: Richard Gere, Jena Malone, and Ben Vereen

**Produced By:** Richard Gere, Caroline Kaplan, Lawrence Inglee

**Status:** Completed

**US Distribution:** IFC Films

**US Release Date:** August 14, 2015

**Logline:** A New York man enters a shelter when he runs out of housing options while struggling to fix a troubled relationship with his daughter.



## HAUNT



**Directed By:** Mac Carter

**Written By:** Andrew Barrer

**Starring**: Harrison Gilbertson, Liana Liberato, Jacki Weaver, Ione Sky, Brian Wimmer, Danielle Chuchran, and Ella Harris

**Produced By:** Sasha Shapiro, Anton Lessine, and Bill Block

**Status:** Completed

**US Distribution:** IFC Films

**US Release Date:** March 7, 2014

**Logline:** An introvert teen befriends his new neighbor, and together the couple begin to explore the haunted house that his family has just purchased.