# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 15-2390-GW(JEMx) | Date | June 11, 2015 |
| Title | QED Holdings, LLC v. William H. Block, et al. | | |

Present: The Honorable GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:  
Steven A. Marenberg  
Joshua B. Gordon

Attorneys Present for Defendants:  
Paul N. Sorrell  
Martin D. Singer

PROCEEDINGS: DEFENDANTS' MOTION FOR AN ORDER COMPELLING ARBITRATION AND DISMISSING THE ACTION OR STAYING THE ACTION PENDING ARBITRATION [18];

DEFENDANTS' MOTION TO DISQUALIFY IRELL & MANELLA, LLP, COUNSEL OF RECORD FOR QED HOLDINGS, LLC [19];

SCHEDULING CONFERENCE

The Court's Tentative Ruling is circulated and attached hereto. Court hears oral argument. Based on the Tentative, and for reasons stated on the record, Defendants' Motion to Disqualify Irell & Manella, LLP, Counsel of Record for QED Holdings, LLC [19] is DENIED. Defendants' Motion to Compel [18] is continued to June 18, 2015 at 8:30 a.m.

The scheduling conference is continued to June 18, 2015 at 8:30 a.m.

: 10

Initials of Preparer JG

<u>**QED Holdings, LLC v. Block, et al.**</u>, Case No. CV-15-2390-GW (JEMx)
Tentative Rulings on: (1) Motion to Compel Arbitration, and (2) Motion to Disqualify

## I. Background

Plaintiff QED Holdings, LLC ("Plaintiff") sues (1) William H. Block ("Block"), (2) QED Pictures, LLC ("QED Pictures"), and (3) QED International, LLC ("QED International") (collectively, "Defendants")[1] and asserts seven causes of action: 1) trademark infringement, Lanham Act § 1125(a)(1)(A); 2) unfair competition, Lanham Act § 1125(a)(1)(A); 3) trademark infringement, Lanham Act § 1141(1)(a); 4) breach of contract; 5) breach of the implied covenant of good faith and fair dealing; 6) conversion; and 7) violation of California Business & Professions Code § 17200 *et seq. See generally* First Am. Compl. ("FAC"), Docket No. 33.

Plaintiff is an independent film company formed by way of a Purchase and Contribution Agreement dated May 15, 2012 (the "Contribution Agreement").[2] *Id.* ¶¶ 1, 17. Under the terms of the Contribution Agreement, Block contributed to Plaintiff virtually all of the assets and goodwill of his company, QED International, in exchange for an investment of $25 million by outside investor Media Content Capital ("MCC"), $22 million of which was to fund film production by Plaintiff and $3 million of which went to Block and his affiliates.[3] *Id.* ¶¶ 1, 19. Among the assets contributed to Plaintiff in the Contribution Agreement were the trademarks "QED" and "QED International." *Id.* ¶¶ 2, 18.

Block served as Plaintiff's CEO and Director between May 2012 and February 2015 pursuant to a written employment agreement (the "Employment Agreement") executed as part of the sale.[4] *Id.* ¶¶ 3, 20. Plaintiff alleges that Block, during his tenure as CEO, stole Plaintiff's assets, leveraged Plaintiff's opportunities for his own personal profit, and violated a provision included in the Contribution Agreement prohibiting Block – and QED International[5] – from engaging in competitive business with Plaintiff for at least five years from the closing date of May 15, 2012. *Id.* ¶¶ 5, 24-25. Additionally, Plaintiff alleges that Defendants have used Plaintiff's trademarks, without authorization, in connection with the development, production, and marketing of motion pictures, thereby sowing confusion in the motion picture industry.[6] *Id.*

---

[1] QED Pictures and QED International are wholly owned by Block. FAC ¶ 4.

[2] Plaintiff asserts that the transaction was "reflected in a series of written agreements among the parties, including the Contribution Agreement," *id.* ¶ 19, and that it was "memorialized" in the Contribution Agreement, *id.* ¶ 1.

[3] After the transaction closed, the investors owned 75% of Plaintiff and Block owned 25%. *Id.* ¶ 1.

[4] The Employment Agreement required Block to perform his duties "loyally and conscientiously," devote substantially all of his business time and attention to Plaintiff's business, avoid "render[ing] commercial or professional services of any nature to any" other person or entity without Plaintiff's written consent, and convey to Plaintiff all rights to his "Employee Inventions" (any idea or concept relating to Plaintiff's film-related business). FAC ¶¶ 3, 20.

[5] Plaintiff also alleges that QED International violated the Contribution Agreement in the various respects described herein. *Id.* ¶ 5.

[6] Although the Contribution Agreement granted QED International a limited, revocable license to use the name "QED" in certain contexts, it did not extend to using the "QED" name in conjunction with any rights held by

1

¶ 4.

Specifically, Plaintiff's present allegations center around four broad incidents. First, Plaintiff alleges that in or around June 2014, Block executed a nondisclosure agreement with Family Time Media, LLC on behalf of BBJF, LLC ("BBJF"), an entity Plaintiff asserts was established for the personal benefit of Block and another of Plaintiff's former executives, John Friedberg. *Id.* at 10 n. 2. The agreement defines BBJF as "QED," even though Plaintiff had no knowledge of or interest in the transaction, and "states that the parties had been exploring and wished to continue to explore 'possible business relationships and opportunities of mutual interest in connection with [a] proposed motion picture slate financing transaction.'" *Id.* Plaintiff asserts that this also constitutes a violation of Block and QED International's covenant in the Contribution Agreement not to use their "name[s] or any part thereof" in connection with any competitive business. *Id.* at 10 n. 2, ¶ 37.

Second, Plaintiff alleges that, no later than August 4, 2014, Block formed QED Pictures, without Plaintiff's authorization, to finance, produce, and/or distribute motion pictures. *Id.* ¶¶ 28, 33. Then, on or about August 5, 2014, Block, executed an agreement between QED Pictures and Chinese investors, pursuant to which the investors pledged to QED Pictures $10 million in financing for a film developed by Plaintiff entitled *Birth of the Dragon*. *Id.* ¶¶ 26, 28. Block guaranteed QED Pictures's performance of its obligations under the agreement by "mortgaging, and pledging as collateral, his [non-existent] interest in the screenplay for and other rights" to *Birth of the Dragon*. *Id.* ¶ 28. A $1 million down payment was paid into an account controlled by Block, but "evidently was hastily returned to the Chinese investors when Block's misconduct was exposed." *Id.* ¶ 29.

Third, in or about September 2014, Block formed Block Entertainment, LLC ("Block Entertainment") and two entities wholly owned by Block Entertainment – Grandpa Productions, LLC ("Grandpa Productions") and DG Licensing, LLC ("DG Licensing") – allegedly "to wrest ownership and control of [a film entitled] *Dirty Grandpa* from [Plaintiff]." *Id.* ¶¶ 36-37. Plaintiff alleges that it began developing *Dirty Grandpa* in or around 2013. *Id.* ¶ 34. QED Writing, LLC ("QED Writing"), an entity wholly owned by Plaintiff, acquired an option to acquire the film's screenplay, which ultimately was exercised.[7] *Id.* ¶¶ 34-35.

Plaintiff alleges that Block formed Grandpa Productions to serve as the production entity for *Dirty Grandpa*, and that Grandpa Productions has entered into certain agreements in furtherance of this plan. *Id.* ¶ 38. For instance, Plaintiff alleges that, through Grandpa Productions, Block retained actors, retained a director, and began filing *Dirty Grandpa* using Plaintiff's name and marks and without Plaintiff's approval. *Id.* ¶ 42

Plaintiff alleges that Block formed DG Licensing to hold rights associated with and to enter into distribution and sales agreement for *Dirty Grandpa*, whereby third parties would pay DG Licensing rather than Plaintiff. *Id.* ¶ 38. On November 3, 2014, Block executed, on behalf of both QED Writing and DG Licensing, an agreement assigning "all of [Plaintiff]'s rights in and to" *Dirty Grandpa* from QED Writing to DG Licensing for nominal consideration and without notice to or approval from Plaintiff's Board. *Id.* ¶¶ 39-40. Plaintiff alleges that Block then

---

Plaintiff, such as the right to exploit film opportunities developed by Plaintiff. *Id.* ¶¶ 18, 30. Additionally, Plaintiff asserts it has since revoked and terminated the license. *Id.* ¶ 18.

[7] Although Plaintiff's board of directors ("Board") reached an intermediate decision in mid-2013 that the *Dirty Grandpa* project required further refinement, the Board encouraged Block and his team to continue to develop it, which they did. FAC ¶¶ 34-35.

2

negotiated a domestic distribution agreement and at least twenty-eight foreign distribution agreements, using Plaintiff's marks and with Plaintiff's resources, pursuant to which DG Licensing sold distribution rights to *Dirty Grandpa* in exchange for payments or the promise to remit proceeds resulting from the film's distribution to DG Licensing. *Id.* ¶ 41. Plaintiff alleges that the agreements also provided that Block would receive producer fees and a portion of sales agent fees that otherwise would have gone to Plaintiff. *Id.*

Plaintiff asserts that despite the above described actions intended to wrest ownership of *Dirty Grandpa* away from Plaintiff (and other inappropriate uses of Plaintiff's name and marks in connection with the *Dirty Grandpa* project), Block has nonetheless committed *Plaintiff* to guarantee compensation and residuals to various guilds in connection with *Dirty Grandpa*. *Id.* ¶¶ 43-46. Plaintiff states that it is "pursuing the return of all rights to *Dirty Grandpa*, and the return of any other misappropriated . . . assets, in the JAMS arbitration." *Id.* ¶ 36.

Fourth, Plaintiff alleges that QED International has failed to transfer certain assets to Plaintiff in accordance with the terms of the Contribution Agreement, including $128,000 formerly held in a bank account and a receivable in the amount of $1,491,072. *Id.* ¶¶ 50-53. Plaintiff believes that the bank account was recently liquidated for Block and/or QED International's benefit and that the receivable was used to offset a $2 million liability QED International owed to Lions Gate Films. *Id.* ¶¶ 50, 53.

Plaintiff seeks, in sum, 1) preliminary and permanent injunctive relief restraining Defendants from using Plaintiff's name and trademarks, unfairly competing with Plaintiff or violating the Contribution Agreement's non-competition provision, or otherwise injuring Plaintiff's business reputation; 2) an order requiring Defendants to destroy any promotional materials using Plaintiff's trademarks in connection with films not owned by Plaintiff; 3) damages, including actual damages, profits gained as a result of Defendants' violations, treble damages, and punitive damages; 4) restitution and/or disgorgement of all benefits Defendants obtained as a result of their unlawful business practices; 5) reasonable attorneys' fees, costs, and expenses; and 6) all such other and further relief as the Court deems just and proper. *Id.* at 26:1-27:18.

Plaintiff alleges in its FAC that it is currently pursuing its remedies for Block's alleged breaches of the Employment Agreement, including "the return of all rights to Dirty Grandpa, and the return of any other misappropriated . . . assets," in a JAMS arbitration pursuant to the Employment Agreement's arbitration clause. *Id.* ¶¶ 3, 36. Indeed, on or about March 6, 2014, Plaintiff served Block with a Demand for Arbitration before JAMS. *See* Mot. to Compel Arb. ("MCA") at 3:24-25, Docket No. 18. Plaintiff's Supplemental Demand for Arbitration and Statement of Claims filed with JAMS includes much of the same factual background as its First Amended Complaint and seven causes of action: 1) breach of fiduciary duty, 2) usurpation of corporate opportunities, 3) fraud, 4) misappropriation of corporate funds, 5) conversion, 6) breach of contract, and 7) breach of the covenant of good faith and fair dealing. *See generally* Decl. of William H. Block in Supp. of MCA ("MCA Block Decl."), Ex. 3, Docket No. 18-1.

## II. Motion to Compel Arbitration
### A. Legal Standard

The Federal Arbitration Act ("FAA") reflects a "liberal federal policy favoring arbitration." *AT&T Mobility L.L.C. v. Concepcion*, ___ U.S. ___, 131 S. Ct. 1740, 1745 (2010) (citation omitted). A party aggrieved by the refusal of another party to arbitrate under a written arbitration agreement may petition the court for an order compelling arbitration as provided for

in the parties' agreement. *See* 9 U.S.C. § 4. "By its terms, the [FAA] leaves no room for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 213 (1985) (emphasis in original); *see also* 9 U.S.C. § 4. "The court's role under the [FAA] is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. If the response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Daugherty v. Experian Info. Solutions, Inc.*, 847 F.Supp.2d 1189, 1193 (N.D. Cal. 2012) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). "While the Court may not review the merits of the underlying case '[i]n deciding a motion to compel arbitration, [it] may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party.'" *Macias v. Excel Bldg. Servs. LLC*, 767 F.Supp.2d 1002, 1007 (N.D. Cal. 2011) (quoting *Ostroff v. Alterra Healthcare Corp.*, 433 F.Supp.2d 538, 540 (E.D. Pa. 2006)).

### *B. Analysis*
#### 1. Impact of Amended Pleading

Defendants filed their Motion to Compel Arbitration on April 23, 2015. *See generally* MCA. Plaintiff filed an Opposition on May 11, 2015. *See generally* MCA Opp'n, Docket No. 30. Thereafter, on May 14, 2015, Plaintiff filed its First Amended Complaint. *See generally* FAC, Docket No. 33. Defendants filed their Reply to Plaintiff's Opposition on May 21, 2015. *See generally* MCA Reply, Docket No. 38.

The majority of the allegations regarding the factual background of the dispute set forth in Plaintiff's First Amended Complaint are identical or nearly identical to those set forth in the original Complaint.[8] *Compare* Compl. ¶¶ 14-16, 18-42, n. 1, Docket No. 1, *with* FAC ¶¶ 17-23, 25-32, 34-45, n. 1-2. The primary difference between the two pleadings is the addition of the last four causes of action: 1) breach of the Contribution Agreement; 2) breach of the Contribution Agreement's implied covenant of good faith and fair dealing; 3) conversion of Plaintiff's property, including the $128,000 formerly held in a bank account; and 4) violation of California Business and Professions Code § 17200 *et seq*. *See* FAC ¶¶ 73-90. Although the parties have neither briefed the question of whether they should be compelled to arbitrate the newly added claims,[9] nor requested the opportunity to do so, the parties have made their positions clear. Nonetheless, the Court would consider allowing supplemental briefing, perhaps limited to Plaintiff's breach of contract claim.

#### 2. A Valid Agreement to Arbitrate Exists
The parties do not dispute that the Employment Agreement executed by Plaintiff and

---

[8] Plaintiff removed allegations included in the original Complaint regarding terms of the Operating Agreement (the "Operating Agreement"), which "further set forth the rights and responsibilities of the parties to the transaction and the rules for operating [Plaintiff], the surviving company after the transaction." *Compare* Compl. ¶¶ 16-17, *with* FAC ¶ 19. Plaintiff's FAC included additional allegations with respect to the *Dirty Grandpa* project, *see* FAC ¶¶ 45-48, and asserted for the first time allegations with respect to Block and QED International's failure to contribute certain assets pledged pursuant to the terms of the Contribution Agreement, *see* FAC ¶¶ 50-53.

[9] Defendants made some reference to the newly added claims in their Reply brief. *See* MCA Reply at 2:8-12, 4:24-28, 5 n. 1

4

Block, with an effective date of May 15, 2012, includes a valid arbitration provision. *See* MCA at 2:27-3:16; MCA Opp'n at 6:26-7:13. Specifically, Section 9 of the Employment Agreement provides as follows:

> Any dispute, controversy or claim (each a "Dispute" and collectively the "Disputes") arising out of, relating to or in connection with this Agreement, including any Dispute regarding its validity or termination, or the performance or breach thereof under this Agreement shall be settled exclusively and finally by a single arbitrator selected by the mutual agreement of the parties to such Dispute in an arbitration proceeding administered by <u>JAMS</u> ("JAMS") under its Comprehensive Arbitration Rules and Procedures . . . .

MCA at 3:6-15 (emphasis in original). To be clear, only Block is a party to the Employment Agreement.

Accordingly, Plaintiff argues that "Defendants must demonstrate that [Plaintiff's] Lanham Act claims fall under [the] scope [of the Employment Agreement's arbitration clause] because [Plaintiff] cannot be compelled to arbitrate those claims absent its agreement to do so." MCA Opp'n at 9:24-26.

### 3. The Contribution Agreement[10]

The Contribution Agreement, dated May 15, 2012, does not include an arbitration provision, but includes a "jurisdiction" clause requiring that the parties "submit to the exclusive jurisdiction of any state or federal court sitting in the state of California, County of Los Angeles for the purpose of any Action arising out of or relating to this Agreement." Decl. of Josh B. Gordon in Supp. of MCA Opp'n ("Gordon Decl."), Ex. A at 61, § 9.9(b), Docket No. 30-1. Pursuant to the terms of the Contribution Agreement, each party "irrevocably waive[d] . . . any claim that it is not subject personally to the jurisdiction of the above-named courts, . . . that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the transactions contemplated by this Agreement may not be enforced in or by any of the above-named courts."[11] *Id.*

---

[10] Defendants contend that their Motion to Compel Arbitration should be granted because Plaintiff's "Opposition is entirely premised upon alleged terms of the Contribution Agreement attached as Exhibit A to the declaration of Plaintiff's counsel[,]" Josh B. Gordon ("Gordon"), which is "inadequate to establish an evidentiary basis for the Motion." *See* MCA Reply at 3:26-4:6. Specifically, Defendants object on the basis that: 1) Gordon is testifying to facts of which he has no personal knowledge, Fed. R. Evid. 602, and 2) Gordon does not indicate when or how he obtained Exhibit A, Fed. R. Evid. 901, *et seq. See* Defs.' Evidentiary Objections at 1:8-14, Docket No. 38-1. The Court overrules both objections.

[11] Plaintiff asserts that Defendants' Motion to Compel Arbitration violates these terms of the Contribution Agreement – specifically, the waiver of challenges—and should be denied on that basis alone. *See* MCA Opp'n at 9:17-21. Specifically, Plaintiff appears to contend that Defendants' Motion to Compel Arbitration should be denied to the extent that it involves any disputes arising only out of or relating only to the Contribution Agreement. *See, e.g.,* MCA Opp'n at 16:8-12 ("[I]t could not be clearer that the parties did not agree to arbitrate [Plaintiff's] Lanham Act claims. Those claims originate in the Contribution Agreement and do not rely on or relate to the Employment Agreement in any way.") To the extent that the Court's understanding of Plaintiff's argument is accurate, the Court tends to agree. Nonetheless, the Court declines to deny Defendants' Motion on this basis because it is not convinced that the disputes arising out of or relating to the Contribution Agreement, as indicated herein, do not relate in any way to the Employment Agreement.

5

### 4. The Arbitration Agreement Encompasses Some of the Disputes at Issue

Defendants assert that Plaintiff's claims in this action should be submitted to arbitration because the claims against Block "arise out of the employment relationship established pursuant to the Employment Agreement" and the claims against QED International and QED Pictures are "dependent upon and intertwined with the alleged obligations of the Employment Agreement." MCA at 1:28-2:11. Plaintiff asserts that it should not be compelled to arbitrate its claims because "all of the damages and other relief [Plaintiff] seeks in this action are to remedy Defendants' illegal conduct *pursuant to [their] Lanham Act violations.*" *See* MCA Opp'n at 8:11-12 (emphasis in original). Therefore, Plaintiff contends, the Court must look to the Contribution Agreement to determine the proper forum for this action. *See id.* at 8:13-14.

Because "[a]rbitration is strictly a matter of consent and thus is a way to resolve those disputes – *but only those disputes* – that the parties have agreed to submit to arbitration," the presumption in favor of arbitrability is applied only where, as here, the parties contest the scope of an agreement to arbitrate. *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 741-42 (9th Cir.), cert. denied, 135 S. Ct. 477 (2014) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010)) (alterations in original). In such situations, arbitration is ordered where the presumption is not rebutted. *See id.*

Broad arbitration clauses, such as those including the phrase "arising in connection with," reach "every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999) (holding that claims of false and misleading representation under the Lanham Act related directly to a licensing agreement, through which the defendant acquired certain exclusive marketing and sales rights, and were subject to arbitration). "To require arbitration, [the] factual allegations need only 'touch matters' covered by the contract containing the arbitration clause and all doubts are to be resolved in favor of arbitrability." *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n. 13 (1985)) (other citation omitted). Here, the arbitration clause requires the arbitration of any dispute "arising out of, relating to or in connection with [the Employment] Agreement," and thus must be construed broadly. MCA at 3:6-15.

Where parties execute an umbrella contract that incorporates as attachments other discrete agreements, however, courts have concluded that even a broad arbitration clause appearing in an attached agreement only compels the arbitration of disputes arising out of that particular agreement. *See Goodrich Cargo Sys. v. Aero Union Corp.*, No. C 06-06226 CRB, 2006 WL 3708065, at *3, 2006 U.S. Dist. LEXIS 93680 (N.D. Cal. Dec. 14, 2006) ("The only logical inference to draw from the fact that the arbitration clause appears only in one of the attachments to the [purchase agreement] is that the parties intended the arbitration clause to apply to part of the transaction, and not to all of it. To hold otherwise would not only permit the tail to wag the dog, it would effectively mean that an arbitration clause included anywhere in a transaction must apply everywhere."); *see also Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 663-66 (7th Cir. 2002) (holding that a purchase agreement and an employment contract enacted simultaneously by the parties pertained to different subject matter and that the compulsory arbitration clause contained in the latter, requiring the arbitration of "any matter in dispute under or relating to this Agreement," did not require the court to dismiss claims arising under the former).

In *Goodrich Cargo Systems*, the parties executed an asset purchase agreement, which had the primary purpose of transferring all assets from the defendant to the plaintiff and which served

6

as the "umbrella contract" for the entire transaction. *Goodrich Cargo Sys.*, 2006 WL 3708065, at *1. The purchase agreement did not contain an arbitration clause, but an arbitration clause was included in the licensing agreement included as a schedule to the purchase agreement. *Id.* The plaintiff filed an action asserting five claims against the defendant: three claims arose under the purchase agreement, one arose under the licensing agreement, and one involved a claim of conversion that, at least on the face of the complaint, did not clearly arise under either agreement. *Id.* The court only compelled the arbitration of the three claims arising under the purchase agreement. *Id.* at *3.

Here, the structure of the transaction parallels the structure of the transaction in *Goodrich Cargo Systems*. Plaintiff states, for example, that the "transaction was reflected in a series of written agreements among the parties, including the Contribution Agreement" and that "as part of the sale, [Plaintiff] and Block also entered into [the] [E]mployment [A]greement." FAC ¶¶ 19-20. Indeed, the Employment Agreement is referenced in the Contribution Agreement and is attached as part of Exhibit A to the Contribution Agreement. *See* Gordon Decl. Ex. A at 10, 14, 22, 51 (including the Employment Agreement in the definition of "Newco Employment Agreements" and listing its execution as a closing condition). Additionally, the arbitration provision in *Goodrich Cargo Systems*, which required the arbitration of "all disputes, claims and controversies that arise under or relate in any way to this Agreement," is of a similar scope as the arbitration provision here, which requires the arbitration of "[a]ny dispute, controversy or claim . . . arising out of, relating to or in connection with this Agreement." *See Goodrich Cargo Sys.*, 2006 WL 3708065, at *3. Because only the Employment Agreement included an arbitration provision, the Court must determine which of the disputes arise out of the Employment Agreement and compel the arbitration of those disputes.

*a. Lanham Act Claims*

Plaintiff's first three causes of action are Lanham Act claims based on 1) Defendants' alleged infringement of the "QED" name and mark, in violation of Lanham Act § 1125(a)(1)(A); 2) unfair competition as a result of Defendants' alleged infringement of the "QED" name and mark, in violation of Lanham Act § 1125(a)(1)(A); and 3) Defendants' alleged infringement of the "QED International" mark, in violation of Lanham Act § 1141(1)(a). *See* FAC ¶¶ 55-72.

These claims do not arise out of the Employment Agreement, which does not include terms relating to Defendants' use of the marks, and Plaintiff thus should not be compelled to arbitrate them. *See Goodrich Cargo Sys.*, 2006 WL 3708065, at *3 (declining to compel the arbitration of a claim that did not clearly arise under the one of two agreements that contained an arbitration clause and the arbitration of two claims arising out of the agreement without the arbitration provision). Moreover, because Plaintiff acquired the right to the exclusive use of the marks pursuant to the Contribution Agreement, claims regarding their misuse arise with respect to the Contribution Agreement. *See Futuredontics, Inc. v. Applied Anagramics, Inc.*, No. CV 97-6991 CM (MANx), 1998 WL 35242853, at *2 (C.D. Cal. June 10, 1998) (concluding that Lanham Act claims were subject to an arbitration provision in a licensing agreement because "the right to use the mark [was] the very subject of the [licensing agreement, and thus] claims as to its misuse arise 'with respect to' that agreement"); *see also ValueSelling Assocs., LLC v. Temple*, No. 09 CV 1493 JM, 2009 WL 3736264, at *4, 2009 U.S. Dist. LEXIS 104174 (S.D. Cal. Nov. 5, 2009) (concluding that Lanham Act claims alleging that the defendant falsely represented the plaintiffs' products related directly to a purchase agreement through which the defendant sold the rights to the products to the plaintiffs).

7

Additionally, while the Court must examine the factual allegations rather than the legal causes of action asserted to determine whether a claim falls within the scope of the arbitration provision, Plaintiff's Lanham Act claims need not be submitted to arbitration simply because some facts relating to the Employment Agreement are also relevant to provide context for the Lanham Act claims. *See Mitsubishi Motors Corp.*, 473 U.S. at 622 n. 9 (1985) (indicating that the key question is whether the factual allegations "are within the scope of the arbitration clause, whatever the legal labels attached to those allegations"); *Marsch v. Williams*, 23 Cal.App.4th 250, 252-53, 256 (1994) (denying a motion to compel the arbitration of claims based on the defendant's conduct with respect to a partnership with the plaintiff that was not subject to an arbitration provision, even though the claims relied on actions the defendant took with respect to a second partnership with the plaintiff that was subject to an arbitration provision).[12] *Marsch* presents a slightly different factual scenario in that the two partnership agreements it involved were not executed at the same time and dealt with entirely unrelated real estate projects, but its reasoning regarding the effect of factual allegations relating to an agreement with an arbitration clause is applicable here.[13] *Id.* at 256.

The Court would deny Defendants' Motion to Compel Arbitration as to Plaintiff's Lanham Act claims.

---

[12] Plaintiff (and, thereafter, Defendants) relies on Delaware law interpreting the scope of arbitration provisions on the basis that the Contribution Agreement includes a Delaware choice of law provision, framing the issue as "whether [Plaintiff's] Lanham Acts claims . . . can be removed from this Court notwithstanding that agreement's unambiguous forum selection clause" and citing several inapposite cases in which California courts enforced choice of law provisions. *See* MCA Opp'n at 12 n. 5. Not surprisingly, none of the cited cases applied one agreement's choice of law provision to the interpretation of a clause in another agreement with a different choice of law provision, as Plaintiff apparently requests here. *See id.* While Delaware law is properly applied to the interpretation of clauses in the Contribution Agreement, the relevant inquiry here is whether the arbitration clause in the Employment Agreement, which includes a California choice of law provision, encompasses Plaintiff's claims. *See* MCA Block Decl., Ex. 1 § 15. As such, the Court considers and applies California law.

[13] *Marsch* involved two separate partnership agreements between the plaintiff and the defendant, the first of which involved the construction and management of a commercial building, and the second of which involved the development of luxury home sites and a golf course. *Marsch*, 23 Cal.App.4th at 252. The defendant acquired its interest in the first partnership in May 1986 pursuant to a partnership agreement without an arbitration provision. *Id.* In December 1986, the parties executed a partnership agreement, containing an arbitration provision, with respect to the second partnership. *Id.* In 1992, the plaintiff filed a complaint asserting several causes of actions, including breach of control and infliction of emotional distress, based on the defendant's conduct in the first partnership. *Id.* at 253. The defendant moved to compel arbitration because the complaint "had its 'roots in the relationship created by the [second partnership agreement]" in that the plaintiff alleged that the defendant's attempt to obtain control over the second partnership undermined the plaintiff's ability to operate the commercial building involved in the first partnership *Id.* The trial court properly denied the motion, looking to the first partnership agreement to determine the arbitrability of disputes with respect to the first partnership because the two "agreements were not closely connected in purpose, did not incorporate one another's terms, were not executed at the same time, and the breach of the [second] agreement did not necessarily lead to the breach of the [first] agreements." *Id.* at 256. The court further emphasized that "[w]here, as here, the parties have separate contractual relationships, which involve separate enterprises and most importantly separate commercial risks, an arbitration clause which governs one contractual relationship cannot be imposed in the other relationship without undermining the parties' reasonable expectations." *Id.* Additionally, the court distinguished several cases cited by the defendant in which "a single contractual relationship was created either by a single contract or a set of interdependent contracts." *Id.* In one case, for example, a defendant breached both a franchise agreement (which contained an arbitration provision), and a sublease of the premises where the franchise operated (which expressly incorporated the franchise agreement). *Id.* The arbitration of the resulting unlawful detainer action was compelled. *Id.*

### b. Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, and Conversion

Plaintiff's fourth cause of action, for breach of the Contribution Agreement, is based on Block and QED International's alleged violation of the Contribution Agreement's non-compete provision and their alleged failure to contribute certain assets pledged to Plaintiff pursuant to the terms of the Contribution Agreement, including $128,000 formerly held in a bank account and a receivable in the amount of $1,491,072. *See* FAC ¶¶ 73-78. Plaintiff's fifth cause of action, for breach of the Contribution Agreement's implied covenant of good faith and fair dealing, is based on Block and QED International's failure to contribute to Plaintiff the same pledged receivable of approximately $1.49 million. *See* FAC ¶¶ 73-82. Plaintiff's sixth cause of action, for conversion, is based on Block and QED International's alleged withholding of Plaintiff's property, including the above-described $128,000. *See* FAC ¶¶ 83-87.

#### i. Arbitrability in General

Block and QED International pledged the assets specifically identified in these three causes of actions pursuant to the Contribution Agreement. *See* ¶¶ 50-53. Thus, to the extent these claims are based on the $128,000 formerly held in a bank account, the receivable of approximately $1.49 million, or other assets pledged pursuant to the Contribution Agreement, they arise out of the Contribution Agreement and are not arbitrable.[14]

As described above, Plaintiff's breach of contract claim also rests on Block and QED International's alleged violation of the Contribution Agreement's non-compete clause. *See id.* ¶¶ 73-78. Although the non-compete clauses included in the Contribution Agreement and the Employment Agreement are not identical, they overlap substantially and impose similar restrictions. To illustrate, the non-compete clause in the Employment Agreement includes an anti-solicitation and anti-hiring provision, and requires that Block perform his duties "loyally and conscientiously" and refrain from rendering commercial or professional services of any nature without Plaintiff's consent. *See* MCA Block Decl., Ex. 1 §§ 1(b), 6(a). The non-compete clause in the Contribution Agreement requires that Block and QED International refrain from engaging in competitive business without Plaintiff's prior written consent. *See* Gordon Decl., Ex. A at 1-3, § 6.3(a). It also includes anti-solicitation and anti-hiring provisions, but with respect to Block, provides that the terms of his Employment Agreement govern for the purposes of those provisions. *See id.* § 6.3. Given that the Contribution Agreement's non-compete clause incorporates portions of the Employment Agreement's non-compete clause, its alleged violation arises under the Employment Agreement and falls within its broad arbitration clause, at least as to the claim asserted against Block.

#### ii. Whether Plaintiff Must Arbitrate Its Breach of Contract Claim Against QED International for the Alleged Violation of the Contribution Agreement's Non-Compete Clause

QED International is not a signatory to the Employment Agreement. Nonetheless, Defendants assert that Plaintiff is required to arbitrate its claims against QED International

---

[14] To the extent that Plaintiff's conversion claim is based on the misappropriation or conversion of funds or property not pledged pursuant to the Contribution Agreement, it would not arise under the Contribution Agreement and may be subject to arbitration. As such, Plaintiff should confirm that its conversion claim is based only on assets pledged pursuant to the Contribution Agreement.

9

because all of the claims alleged against QED International 1) involve its "alleged use of [Plaintiff's] marks and business opportunities resulting from Block's misconduct in violation of his rights and responsibilities under the Employment Agreement" and 2) "involve substantially interdependent and concerted alleged misconduct with Block, and . . . are founded in or intimately connected with the obligations of the Employment Agreement."[15] *See* MCA at 9:24-10:9.

"The United States Supreme Court has held that a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement." *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1229 (9th Cir. 2013) (quoting *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013)). "[E]quitable estoppel of third parties in this context is narrowly defined." *Id.* (citing *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1046 (9th Cir. 2009)). Under California law, a signatory to an arbitration agreement will be equitably estopped from avoiding arbitration with a non-signatory only under two very specific conditions:

> (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are intimately founded in and intertwined with the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement.

*Id.* (quoting *Kramer*, 705 F.3d at 1128-29).

As to the first prong, Plaintiff's claim for breach of the Contribution Agreement's non-compete clause against QED International relies on the terms of the Contribution Agreement; it does not rely on and is not intertwined with the substance of the Employment Agreement. Although the Employment Agreement includes a non-compete provision that is incorporated in the Contribution Agreement's non-compete clause as to Block, the allegations regarding QED International's breach of the Contribution Agreement's non-compete clause do not rely on the Employment Agreement or attempt to seek any benefit from its terms. Equitable estoppel is therefore inapplicable under this prong. *See Murphy*, 724 F.3d at 1230-31 (finding that equitable estoppel was not warranted where "[n]one of the allegations rel[ied] on the Customer Agreement or attempt[ed] to seek any benefit from its terms").

The second prong presents a closer question. As to the second prong, equitable estoppel may apply "where a signatory to an arbitration agreement attempts to evade arbitration by suing nonsignatory defendants for 'claims that are based on the same facts and are inherently inseparable from arbitrable claims against signatory defendants.'" *Murphy*, 724 F.3d at 1231 (quoting *Metalclad Corp. v. Ventana Envtl. Organizational P'ship*, 109 Cal.App.4th 1705, 1712 (2003)). However, the "'allegation[] of collusive behavior by signatories and nonsignatories, with no relationship to the terms of the underlying contract,' does not justify application of equitable estoppel to compel arbitration." *Id.* at 1232 (quoting *Goldman v. KPMG LLP*, 173 Cal.App.4th 209, 227 (2009)). Here, Plaintiff's claim for QED International's breach of the Contribution Agreement's non-compete clause bears the requisite relationship to the Employ-

---

[15] The Court does not discuss whether Plaintiff is bound to arbitrate its claims against QED Pictures because the only claims Plaintiff has asserted against QED Pictures are based on Lanham Act violations and are not arbitrable.

ment Agreement. Although each of the two agreements includes its own non-compete clause, the overlap between the clauses and the resulting claims, the direct connection between the two clauses by way of the Contribution Agreement's incorporation of portions of the Employment Agreement's non-compete clause as to Block, and the collusive behavior of Block and QED International is sufficient to warrant equitable estoppel to compel the arbitration of Plaintiff's claim against QED International for the breach of the Contribution Agreement's non-compete clause.

c. *Violation of California Business & Professions Code § 17200 et seq.*

Plaintiff's cause of action for the violation of California Business & Professions Code § 17200 *et seq.* against Block, QED International, and QED Pictures borrows Plaintiff's Lanham Act and conversion claims. *See* FAC ¶¶ 88-90. For the same reasons as indicated above, these claims are not arbitrable.

5. Pending Arbitration

Block's declaration in support of Defendants' Motion refers to a settlement agreement that Plaintiff and Block allegedly executed in December 2014 (the "Settlement Agreement"), which included a mutual release of claims. *See* MCA Block Decl. ¶¶ 5-6, Ex. 2 ¶ 8. Block's Statement of Counterclaims and Cross-Claims in the JAMS arbitration, which Defendants attached to their Motion, further discusses the alleged Settlement Agreement and asserts claims for declaratory relief and breach of contract with respect to the Settlement Agreement. *See id.,* Ex. 4 at 8:22-10:12. As Defendants argue for the first time in their Reply brief, "[i]f the arbitrator determines that a valid and binding settlement was reached, there will be no case left to litigate. Therefore, this action should be stayed to allow arbitration of this critical preliminary issue." *See* MCA Reply at 1:9. Plaintiff further states that the Settlement Agreement "expressly authorized Block to develop *Dirty Grandpa* in association with [Plaintiff], with the parties sharing the proceeds of the film, and also to develop other projects outside [Plaintiff] notwithstanding the alleged non-compete clause."[16] *See id.* at 2:14-17.

Additionally, Plaintiff has submitted to the pending arbitration claims for breach of contract and breach of the implied covenant of good faith and fair dealing based on the "several valid and enforceable agreements [to which Plaintiff and Block are parties], including [the] Employment Agreement and the ... Operating Agreement." *See* MCA Block Decl., Ex. 3 ¶¶ 29, 34. Although this language technically includes the Contribution Agreement, Plaintiff states in footnote in its arbitration brief that it "intends to pursue remedies for [Block's breach of the Contribution Agreement's non-compete clause and Block's failure to contribute the $1.49 million receivable to Plaintiff in violation of the Contribution Agreement] in a civil action." *See id.,* Ex. 3 at 12 n. 8. Nonetheless, the Court would consider staying the litigation of Plaintiff's claims (or perhaps parts thereof) pending the outcome of arbitration in light of the broad scope of the actual claims submitted to arbitration, as well as the pending arbitration of counterclaims involving the alleged mutual release of all claims and Plaintiff's alleged authorization of the use of its marks. The Court will discuss this issue further with the parties at the hearing.

---

[16] Here, Defendants presumably refer to two provisions of the alleged Settlement Agreement: One provides that Plaintiff was entitled to 80% of sales agency and producer fees derived from *Dirty Grandpa* and 50% of any "back end" payable on *Dirty Grandpa*, with Block entitled to the remainder. *See* MCA Block Decl., Ex. 2 ¶ 3. The second provides that Block is entitled to 100% of the proceeds derived from film projects produced after January 31, 2015 that were not owned by Plaintiff as of that date and to which none of Plaintiff's resources were contributed prior to that date. *Id.* ¶ 5.

### 6. Plaintiff's Notices of New Information

On May 12, 2015 and again on June 4, 2015, Plaintiff filed Notices of New Information Bearing on Defendants' Motion to Compel Arbitration (the "Notices"), which present a dispute as to the parties' financial obligations in the pending JAMS arbitration. *See generally* Notice of New Info., Docket No. 32 ("Notice 1"); Notice of New Info., Docket No. 50 ("Notice 2"). Plaintiff states that this information is relevant to the Court's determination of the Motion to Compel Arbitration, with no further explanation of its purported relevance. *See* Notice 1 at 1:3; Notice 2 at 1:1-6. The Court disagrees; given the applicable legal standard, as set forth above, this information is irrelevant to whether arbitration should be compelled. Plaintiff is advised to refrain from submitting frivolous filings and that the failure to do so may subject it to sanctions pursuant to Federal Rule of Civil Procedure 11(b).

### *C. Conclusion*

In sum, the Court would GRANT Defendants' Motion to Compel Arbitration only as to Plaintiff's fourth cause of action, for breach of the Contribution Agreement, to the extent that it involves the violation of the Contribution Agreement's non-compete clause. However, the Court will consider staying the litigation (or parts of the remaining disputes) pending the outcome of arbitration. Although this may not be the most efficient way forward, the Court "cannot expand the parties' agreement to arbitrate in order to achieve greater efficiency." *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1294 (9th Cir. 1994) ("The Federal Arbitration Act '*requires* piecemeal resolution when necessary to give effect to an arbitration agreement.'" (emphasis in original)) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Construction Corp.*, 460 U.S. 1, 20 (1983)).

## III. Motion to Disqualify
### *A. Legal Standard*

The Central District has adopted California's ethical standards governing attorney conflicts of interest. *See* C.D. Cal. L.R. 83-3.1.2; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) ("By virtue of the district court's local rules, California law controls whether an ethical violation occurred") (citing C.D. Cal. L.R. 83-3.1.2).[17] A court in this district has the inherent authority to disqualify an attorney or firm as counsel for violating those standards, either of its own accord or in response to a motion to disqualify counsel. *Erickson v. Newmar Corp.*, 87 F.3d 298, 303 (9th Cir. 1996) (explaining that district courts have "inherent powers to manage their own proceedings and to control the conduct of those who appear before them," and "an arsenal of sanctions they can impose for unethical behavior," including "disqualification of counsel"); *see also People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.* ("*SpeeDee Oil*"), 20 Cal.4th 1135, 1145 (1999) ("A trial court's authority to disqualify an attorney derives from the power inherent in every court to control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it.") (citations and quotations omitted, punctuation altered).

When considering a disqualification motion based on alleged conflicts of interest, the court's "paramount concern" is always preserving public trust in the legal profession's integrity. *SpeeDee Oil*, 20 Cal.4th at 1145. But the court must also be cognizant of other considerations, including the impact disqualification may have on a party's right to chosen counsel, an attorney's

---

[17] Local Rule 83-3.1.2 also allows courts to consider the American Bar Association's Model Rules of Professional Conduct as guidance. *See* C.D. Cal. L.R. 83-3.1.2.

interest in representing a client, and the financial burden on a client of replacing disqualified counsel. *William H. Raley Co. v. Superior Court*, 149 Cal.App.3d 1042, 1048 (1983). Consequently, courts must evaluate disqualification motions holistically "to ensure that literalism does not deny the parties substantial justice." *SpeeDee Oil*, 20 Cal.4th at 1144. And because disqualification motions are "especially prone to tactical abuse," *Sharp v. Next Entm't, Inc.*, 163 Cal.App.4th 410, 424 (2008), and are "strongly disfavored," *Visa U.S.A., Inc. v. First Data Corp.*, 241 F. Supp. 2d 1100, 1104 (N.D. Cal. 2003), the court must subject their evidence and arguments to "particularly strict judicial scrutiny," *Optyl Eyewear Fashion Int'l Corp. v. Style Cos., Ltd.*, 760 F.2d 1045, 1050 (9th Cir. 1985) (citations and quotations omitted).

### B. Analysis
#### 1. Evidentiary Objections

a. Plaintiff's Evidentiary Objections to the Declaration of William H. Block in Support of Motion to Disqualify ("Block Decl.") (Docket No. 19-2), Docket No. 31-29
1. Overruled.
2. Sustained on best evidence grounds given that the emails were not attached to the declaration. Defendants, however, have since filed copies of the emails under seal, rendering this objection moot. *See* Docket No. 45.
3. Overruled.

b. Defendants' Evidentiary Objections to the Declaration of Joshua B. Grode in Support of Opposition to Motion to Disqualify (Docket No. 31-7), Docket No. 36.
1. (¶ 3)[18] Overruled.
2. (¶ 7) Overruled.
3. (¶ 8) Overruled.
4. (¶ 9) Sustained on the grounds that it is argumentative.
5. (¶ 11) Overruled.
6. (¶ 15) Overruled.
7. (¶ 16) Overruled.
8. (¶ 17) Overruled.
9. (¶ 20) Overruled.
10. (¶ 24) Overruled
11. (¶ 25) Overruled.
12. (¶ 26) Overruled.
13. (¶ 27) Overruled.
14. (¶ 28) Overruled.
15. (¶ 29) Overruled.
16. (¶ 30) Overruled.
17. (¶ 31) Overruled.
18. (¶ 32) Overruled.
19. (¶ 33) Overruled.
20. (¶ 35) Overruled.
21. (¶ 44) Overruled.
22. (¶ 45) Overruled.

---

[18] Defendants numbered their objections only by paragraph number, which are listed here to avoid confusion.

c. Defendants' Evidentiary Objections to the Supplemental Declaration of Joshua B. Grode in Support of Opposition to Motion to Disqualify ("Supp'l Grode Decl.") (Docket No. 48-4), Docket No. 49
   1. Overruled.
   2. Overruled.
   3. Sustained.
   4. Overruled.
   5. Sustained.
   6. Overruled.
   7. Sustained.
   8. Sustained.
   9. Overruled.
   10. Overruled.
   11. Overruled.

2. <u>Disqualification of Plaintiff's Counsel Is Not Warranted</u>

California Rule of Professional Conduct 3-310(E) provides: "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment."

Defendants move to disqualify Irell & Manella LLP ("Irell") as counsel for Plaintiff on the grounds that Joshua B. Grode ("Grode"), formerly a partner at Liner Grode Yankelevitz (the "Liner Firm") and now a partner at Irell, violated Rule 3-310(E) because he acted as Block and/or QED International's counsel with respect to several previous transactions, including the 2012 transaction resulting in the Contribution Agreement and the associated agreements (the "2012 Transaction"), and never obtained their informed written consent to Grode's representation of Plaintiff. *See* Mot. to Disqualify at 3:15-23, 4:22-27, 5:10-26, Docket No. 19.

Plaintiff counters that Grode never represented Block, but actually represented his counterparty in each of the transactions raised in Defendants' Motion. *See* Mot. to Disqualify Opp'n at 7:2-16, Docket No. 31. According to Plaintiff, Chris Corabi ("Corabi"), an in-house lawyer at QED International, represented Block and QED International in connection with the 2012 Transaction in which Plaintiff was formed, *id.* at 9:5-13, 19:17-20:10, while Grode represented their counterparty, investor Media Opportunity Capital Partners, L.P. ("MCC"), *id.* at 7:19-8:23. Because Grode represented QED International "in connection with certain corporate and financing matters" in 2008, he obtained written consent to his representation of MCC in connection with the 2012 Transaction from both QED International[19] and Rivergate, Entertainment, LLC, the managing member of MCC. *See id.* at 15:4-14; Supp'l Grode Decl. ¶ 7 ("I had previously represented QED International, LLC in connection with a film financing transaction that closed in approximately 2008."). As to the Settlement Agreement negotiations, Plaintiff states that Noel Lohr ("Lohr") and, later, Defendants' counsel in this action represented Block, while Grode represented Plaintiff and its shareholder, MCC. *See* Mot. to Disqualify Opp'n at 21:23-23:11.

"Before an attorney may be disqualified from representing a party in litigation because

---

[19] Block signed the waiver on behalf of QED International, but was not asked to sign a waiver in his individual capacity because Block was never a client of the Liner Firm or Grode. *See* Mot. to Disqualify Reply at 15:16-16:10.

his representation of that party is adverse to the interest of a current or former client, it must first be established that the party seeking the attorney's disqualification was or is 'represented' by the attorney in a manner giving rise to an attorney-client relationship." *Chih Teh Shen v. Miller*, 212 Cal.App.4th 48, 56 (2012) (citation omitted). "The burden is on the party seeking disqualification to establish the attorney-client relationship." *Id.* The formation of an attorney-client relationship is a question of fact, which hinges on the intent and conduct of the parties. *See id.* "When a party seeking legal advice consults an attorney at law and secures that advice, the relation of attorney and client is established *prima facie*." *Id.* (quoting *SpeeDee Oil*, 20 Cal.4th at 1148) (emphasis in original).

To demonstrate the existence of an attorney-client relationship, Defendants rely on correspondence between Block and Grode with respect to the various transactions.[20] *See, e.g.,* Block Decl. ¶¶ 4, 5, 7, 9-10. At most, Block's sworn statements and the original copies of the correspondence that were belatedly submitted to the Court indicate that Grode, on behalf of MCC, was in contact with Block in the course of negotiating and conducting due diligence for the various transactions. No evidence indicates that Block or QED International was Grode's client with respect to any of the transactions. Rather, the evidence indicates just the contrary.

Plaintiff has submitted ample evidence demonstrating that Grode did not act as counsel for Defendants, including in relation to the 2012 Transaction and the Settlement Agreement. For instance, Plaintiff provided correspondence between the Liner Firm and Corabi in which Corabi returned drafts of various agreements for the 2012 Transaction with Defendants' notes, reserved Defendants' rights to further comment, and eventually provided the signature pages for Block and other of QED International's original investors. *See* Mot. to Disqualify Opp'n at 10:4-11:10, 19:23-20:10. Additionally, QED International's consent to Grode's representation of MCC demonstrates, at a minimum, that Block knew that Grode was not representing QED International in connection with the 2012 Transaction. With respect to the Settlement Agreement, Plaintiff provided correspondence between Grode and Lohr in which Lohr sent Block's comments on the proposed term sheet to Grode and reserved Block's right to make further changes. *See id.* at 22:20-23:2.

Defendants also point to emails between Block and Grode in October 2014 in which Block forwarded to Grode a press release, scheduled to be distributed that morning, regarding a deal Block made with Merced Media; Grode replied: "Cool - how about Block repped by Grode at [I]rell at the end :)." *See* Mot. to Disqualify at 5:22-27. The press release ultimately distributed that morning included at the end: "Block is represented by Josh Grode at Irell & Manella." *See id.* at 6:1-3. However, as to email exchange, Grode states that he was only joking, as indicated by his use of the emoticon and given that he "*never discussed* the Merced transaction with Block and *never knew* the terms of that transaction." Mot. to Disqualify Opp'n at 23:14-25:8 (emphasis in original). The only evidence Defendants submit to the contrary is

---

[20] Defendants also emphasize in their Reply brief that if Grode was not Block's counsel, Grode's direct contact with Block with respect to the 2012 Transaction was in violation of California Rule of Professional Conduct 2-100, which prohibits attorneys from directly contacting a party known to be represented by counsel. *See* Mot. to Disqualify Reply at 4:24-5:18, Docket No. 35. When the Court granted Plaintiff the opportunity "to file an opposition to the under seal documents" that Defendants filed only with their Reply, *see* Docket No. 46, Plaintiff extended the Court's latitude by filing a Sur-Reply that also addressed arguments made in the Defendants' Reply brief, *see* Mot. to Disqualify Sur-Reply, Docket No. 48. Plaintiff includes several arguments as to why Grode did not violate Rule 2-100, including that Grode did not know that Block was represented by counsel at the time. *See id.* at 10:10-13:2. In any event, even if a violation of Rule 2-100 occurred, it would not warrant the disqualification of Plaintiff's counsel. *See Cont'l Ins. Co. v. Superior Court*, 32 Cal. App. 4th 94, 111 n.5 (1995).

Block's statement that he "consulted with Grode in connection with the deal" and that Grode provided advice "to facilitate [Block's transition from [Plaintiff]." Block Decl. ¶ 9. A statement as to legal representation that, based on the evidence presented, appears to have been made in jest does not create or demonstrate the existence of an attorney-client relationship.

### C. Conclusion

The Court would DENY Defendants' Motion to Disqualify Irell as Plaintiff's counsel.[21] Additionally, although the Court elected to consider all arguments and evidence submitted with respect to both this Motion and Defendants' Motion to Compel Arbitration, it should indicate to the parties that, moving forward, it will require strict compliance with all local rules and will decline to consider evidence or arguments presented for the first time in reply briefs or thereafter. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

---

[21] Defendants are cautioned to refrain from filing motions that can be construed as frivolous. *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1416 (9th Cir. 1990) (finding that the district court did not abuse its discretion in imposing sanctions for a motion to disqualify that offered no evidence of an attorney-client relationship).